**Sidney CLARK and Julia Clark et al.,**
**Plaintiffs-Appellants,**

**v.**

**UNIVERSAL BUILDERS, INC., et al.,**
**Defendants-Appellees.**

**No. 72–1655.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1973.

Decided July 26, 1974.

Certiorari Denied Dec. 16, 1974.
See 95 S.Ct. 657.

Ronald S. Samuels, Thomas J. Boodell, Jr., Thomas P. Sullivan, and John C. Tucker, Chicago, Ill., for plaintiffs-appellants.

Burton Y. Weitzenfeld, Chicago, Ill., for defendants-appellees.

William J. McNally, Chicago, Ill., for amicus curiae.

Before SWYGERT, Chief Judge, SPRECHER, Circuit Judge, and GRANT, Senior District Judge.*

SWYGERT, Chief Judge.

This appeal is from a grant of a directed verdict for defendants at the close of the plaintiffs' case in chief. Plaintiffs are a class of black citizens who purchased newly constructed houses in Chicago from defendants under land installment contracts during the period from 1958 to 1968. Defendants include the building contractor of the houses and the various land companies through which the houses were sold to plaintiffs.[1] In the district court plaintiffs claimed that as a result of intense racial discrimination in Chicago and its metropolitan area there existed at all pertinent times a housing market for whites and a separate housing market for blacks, the latter confined to a relatively small geographical area in the central city. Plaintiffs contended that the demand among blacks for housing greatly exceeded the supply of housing available in the black market and that the defendants exploited this situation by building houses in or adjacent to black areas and selling the houses to plaintiffs at prices far in excess of the amounts which white persons paid for comparable residences in neighboring urban areas, and on onerous terms far less favorable than those available to white buyers of similar properties, all in violation of plaintiffs' rights under the Thirteenth and Fourteenth Amendments and under the Civil Rights Act of 1866.[2] Plaintiffs' exploitation theory of liability was sustained by District Judge Hubert Will as stating a claim for relief under section 1982 of the Civil Rights Act of 1866. Accordingly, Judge Will denied defendants' motion to dismiss plaintiffs' complaint. Contract Buyers League v. F & F Investment, 300 F.Supp. 210 (1969), aff'd on other grounds, 420 F.2d 1191 (7th Cir. 1970), cert. denied, Universal Builders, Inc. v. Clark, 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970). The case then went to trial before District Judge Joseph Sam Perry, and plaintiffs, pursuant to Judge Will's approval of their exploitation theory of liability under section 1982, presented evidence before a jury of defendants' alleged exploitation of the discriminatory housing situation prevalent in Chicago during the period 1958 through 1968. Upon completion of plaintiffs' case in chief, Judge Perry granted defendants' motion for directed verdict, holding in opposition to Judge Will's theory of the case that:

. . . [C]ounsel for the plaintiffs have not painted a pretty picture of the defendants, but that picture is a picture of exploitation for profit, and not racial discrimination.

\* . \* \* \* \* \*

Nowhere in the six weeks' trial is there one scintilla of evidence that the defendants or any of them or their agents ever refused to sell to a white person or a black person or a non-white person any house or refused to sell one or the other at a higher or lower price, absolutely no positive evidence of discrimination in this record.

\* \* \* \* \* \*

Accordingly, for want of any evidence in support of the complaint, the motion for a directed verdict by all of

---

* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. The builder of the homes was Universal Builders, Inc. The land was owned and sales were made in the names of various land companies: Larchmont Home Development Co.; Rosewood Corporation; Independence Homes, Inc.; Hamilton Corporation; Lawson Corporation; Jarvis Homes, Inc.; and Chatham Town Homes, Inc. Universal entered into joint venture agreements with each of the land companies whereby Universal agreed to build homes on the land companies' lots.

2. Although plaintiffs brought their civil rights action under the federal Civil Rights Act, 42 U.S.C. §§ 1981, 1982, 1983 and 1985 (3) they have grounded their appeal on 42 U.S.C. § 1982.

the defendants now on trial is hereby granted, and the complaint of all of the plaintiffs is hereby dismissed as to all of the defendants.

Under Judge Perry's theory of the case, absent evidence of defendants' sales of the same or similar housing to whites on more favorable terms and prices, namely, the traditional theory of racial discrimination, plaintiffs failed to make out a case of liability under section 1982.

Plaintiffs raise numerous issues in this appeal the most important of which of course is the correctness of the grant of a directed verdict for the defendants. The other issues can broadly be categorized as challenges to the correctness of certain of the trial judge's evidentiary rulings and other procedural rulings.

In judging the propriety of the grant of the directed verdict, we are confronted with two issues. We must first resolve the conflict as to the scope of section 1982. That is, we must determine whether section 1982 covers only the so-called traditional type of discriminatory conduct, or whether a claim may be stated under section 1982 by proof of exploitation of a discriminatory situation already existing and created in the first instance by the action of persons other than defendants. If we determine that section 1982 is violated under the latter theory we then must determine whether the evidence, both the admitted evidence and erroneously excluded evidence, when viewed in the light most favorable to plaintiffs, together with all inferences that may be reasonably drawn therefrom, is such that it can be found that plaintiffs have made out a *prima facie* case.

I

Section 1982 of the Civil Rights Act of 1866 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.[3]

Plaintiffs' "exploitation" theory of liability under this section can briefly be restated as follows: As a result of racial discrimination there existed two housing markets in Chicago, one for whites and another for blacks, with the supply of housing available in the black market far less than the demand. Defendants entered the black market selling homes for prices far in excess of their fair market value and far in excess of prices which whites pay for comparable homes in the white market and on more onerous terms than whites similarly situated would encounter. Plaintiffs contend that by so acting defendants seized upon and took advantage of the opportunity created by racial residential segregation to exploit blacks in violation of section 1982.

It is asserted that to countenance such actions by the defendant would be in direct contravention of the express language of section 1982 which provides by clear implication that black citizens "shall have the same right . . . as is enjoyed by white citizens . . . to . . . purchase . . . real . . . property." Moreover, plaintiffs claim

3. Section 1982 in its original form was part of section 1 of the Civil Rights Act of 1866. That section provided:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all persons born in the United States and not subject to any foreign power, . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary, notwithstanding.

that a ruling which would hold defendants' asserted acts of exploitation to be outside of the coverage of section 1982 would be contrary to the Supreme Court's declaration in Jones v. Mayer Co., 392 U.S. 409, 443, 88 S.Ct. 2186, 2205, 20 L.Ed.2d 1189 (1968), and that section 1982 was meant to be a vehicle through which "to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man."

Defendants contend that absent a showing of the traditional form of discrimination, namely, that defendants refused to sell to blacks because of their race, or offered to sell the same houses to whites at lower prices or on more favorable terms than they offered to sell to blacks, plaintiffs have not made out a case under section 1982. Defendants assert that the houses they sold to plaintiffs in the black market were available to whites and would have been sold on the same terms and for the same prices as sales to the black plaintiffs. Therefore, defendants argue, plaintiffs enjoyed "the same right" as enjoyed by white citizens to purchase houses in the black market. Moreover, it is urged that other sellers and not defendants discriminated against plaintiffs in the first instance by refusing to sell to plaintiffs housing in other urban areas, thereby excluding them from the white market. The defendants claim that an extension of section 1982 so as to proscribe their alleged acts of exploitation would be tantamount to holding defendants liable for the discrimination of others without a showing of any discrimination by defendants. With respect to the Supreme Court's decision in Jones v. Mayer Co., the defendants suggest that it lends no support to the plaintiffs' desired interpretation of section 1982. Rather, defendants view Jones v. Mayer Co. as authority for their contention that section 1982 prohibits only the so-called traditional type of discrimination and does not encompass plaintiffs' theory of exploitation liability. Also, defendants urge that plaintiffs' interpretation of section 1982 would render that section unconstitutionally vague and would expose defendants to risk or detriment without fair warning of the nature of the proscribed conduct. It is on the basis of these arguments that defendants claim that no case can be made under section 1982 for exploitation absent a showing that defendants offered to sell the same or similar homes to whites at lower prices and on more favorable terms than they made available to blacks. We do not agree.

At the outset we note that section 1982 is framed in broad yet clear language. It provides that:

> All citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof to . . . purchase . . . real . . . property.

Facially, therefore, the scope of section 1982 would appear to be rather far reaching; indeed such a reading of the statute is supported by the Supreme Court's interpretation of section 1982 in Jones v. Mayer Co., 392 U.S. 409, 88 S. Ct. 2186, 20 L.Ed.2d 1189 (1968). In that case the Court was confronted with questions as to the scope and constitutionality of section 1982. The plaintiff in that case, a black person, brought an action pursuant to section 1982 claiming that the defendants refused to sell him a house on the basis of his race. The district court dismissed the plaintiff's complaint, and the court of appeals affirmed, concluding that section 1982 applied only to state action and not private action. The Supreme Court rejected the argument for a narrow construction of section 1982, holding in broad language:

> [T]hat § 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment. 392 U.S. 413, 88 S.Ct. 2189 [Emphasis in original].

The Court went on to note that section 1982 was an attempt by Congress to

provide "that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens alike" and that Congress "plainly meant to secure that right against interference from any source whatever, whether governmental or private." 392 U.S. at 423–424, 88 S.Ct. at 2195. The Court concluded its analysis by stating that section 1982 must be accorded " 'a sweep as broad as its language.' " 392 U.S. at 437, 88 S.Ct. at 2202. Observing that "when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery," the Court proceeded to uphold the constitutionality of section 1982 stating:

> Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom—freedom to "go and come at pleasure" and to "buy and sell when they please"— would be left with "a mere paper guarantee" if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man. At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep. 392 U.S. 443, 88 S. Ct. 2205.

Clearly the Court's decision in Jones v. Mayer Co. does not, contrary to defendants' assertions, detract from plaintiffs' contention as to the scope of section 1982. Rather, the decision is support for plaintiffs' theory for in *Jones* the Court viewed section 1982 as a broad based instrument to be utilized in eliminating all discrimination and the effects thereof in the ownership of property. Accordingly, Jones v. Mayer Co. does

not stand as an obstacle to plaintiffs' case, but supports it.

■■ Defendants insist that section 1982 cannot be construed to encompass other than the traditional type of discrimination, that is, that defendants offered to sell to whites on more favorable terms and prices than to plaintiffs. Keeping in mind the Supreme Court's admonition in Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939), that the Constitution and statutes promulgated in its enforcement nullify "sophisticated as well as simple-minded modes of discrimination," we reject defendants' notion of adherence to a strict, rigid, and traditional type of discrimination. We need not resort to a labelling exercise in categorizing certain activity as discriminatory and others as not of such character for section 1982 is violated if the facts demonstrate that defendants exploited a situation created by socioeconomic forces tainted by racial discrimination. Indeed, there is no difference in results between the traditional type of discrimination and defendants' exploitation of a discriminatory situation. Under the former situation blacks either pay excessive prices or are refused altogether from purchasing housing, while under the latter situation they encounter oppressive terms and exorbitant prices relative to the terms and prices available to white citizens for comparable housing.

To avoid this conclusion, defendants contend that even though the results obtained under both the traditional and exploitation theories are similar, they come about through significantly different means. Under the traditional theory a black man is denied the "same right" as a white man in that the seller offers to sell the same house to each but at different prices and terms due to the differences in race of the prospective buyer. It is defendants' position that they offered the plaintiffs the same terms and prices they would offer whites. Therefore it is asserted that plaintiffs had the same right as white citizens

This argument ignores current realities of racial psychology and economic practicalities. Defendants can find no justification for their actions in a claim that they would have sold on the same terms to those whites who elected to enter the black market and to purchase housing in the ghetto and segregated inner-city neighborhoods at exorbitant prices, far in excess of prices for comparable homes in the white market. It is no answer that defendants would have exploited whites as well as blacks. To accept defendants' contention would be tantamount to perpetuating a subterfuge behind which every slumlord and exploiter of those banished to the ghetto could hide by a simple rubric: The same property would have been sold to whites on the same terms.

Defendants urge that other sellers and not they were the active agents of discrimination. That is, blacks were excluded from the white market by other sellers who refused to sell to plaintiffs and that accordingly plaintiffs' action lies solely against those other owners and real estate operators and not the defendants. But, we repeat, defendants cannot escape the reach of section 1982 by proclaiming that they merely took advantage of a discriminatory situation created by others. We find repugnant to the clear language and spirit of the Civil Rights Act the claim that he who exploits and preys on the discriminatory hardship of a black man occupies a more protected status than he who created the hardship in the first instance. Moreover, defendants' actions prolong and perpetuate a system of racial residential segregation, defeating the assimilation of black citizens into full and equal participation in a heretofore all white society.[4] Through the medium of exorbitant prices and severe, long-term land contract terms blacks are tied to housing in the ghetto and segregated inner-city neighborhoods from which they can only hope to escape someday without severe financial loss. By demanding prices in excess of the fair market value of a house and in excess of what whites pay for comparable housing, defendants extract from blacks resources much needed for other necessities of life, thereby reducing their standard of living and lessening their chances of escaping the vestiges of a system of slavery and oppression.[5] Indeed, defendants' activity encourages overt discrimination by others since it deflects or forestalls a frontal attack on such discrimination by offering the long-oppressed black an unattractive yet alternative choice to that of a confrontation for equal buyers' rights in a white neighborhood.

Defendants in effect contend that this is solely a matter of economics and not of discrimination. We cannot accept this contention for although the laws of supply and demand may function so as to establish a market level for the buyer in the black housing areas, it is clear that these laws are affected by a contrived market condition which is grounded in and fed upon by racial discrimination—that is, the available supply of housing is determined by the buyer's race. In other contexts the law has prevented sellers from charging whatever the market will bear when special circumstances have occasioned market shortages or superior bargaining posi-

---

4. As we recently stated in Barrick Realty, Inc. v. City of Gary, Indiana (1974), 491 F. 2d 161, at p. 164:
   [T]he goal of our national housing policy is to "replace the ghettos with 'truly integrated and balanced living patterns'" for persons of all races.
   Defendants' alleged actions are in conflict with such an effort.

5. Charging prices greater than white citizens pay for comparable housing means that blacks are required to dedicate a greater portion of their income to housing than white citizens, leaving less to spend on other necessary items such as education, medical care, food, clothing, home improvements and recreation. As a result, the exploitation of the dual housing market assists in the relegation of blacks to a continuing position of social inequality and inferiority while those who exploit the dual housing market enjoy the benefits of enormous wealth exacted from black citizens.

tions. In such instances sellers were denied the opportunity to exploit others merely because the opportunity existed.

■ Contrary to the trial court's stance, the shortage of housing here was triggered not by an economic phenomenon but by a pattern of discrimination that has no place in our society.[6] Accordingly, neither prices nor profits— whether derived through well-intentioned, good-faith efforts or predatory and unethical practices—may reflect or perpetuate discrimination against black citizens. We agree with Judge Will's statement that "there cannot in this country be markets or profits based on the color of a man's skin." Contract Buyers League v. F & F Investment, 300 F.Supp. 210, 216 (N.D.Ill.1969).[7] Price and profit differentials between individual buyers may be justified on a multitude of grounds; for example, the prospective purchaser's reputation or his financial position and potential earning power. But price or profit may not turn on whether the prospective buyer has dark or light pigmentation.[8]

Defendants urge that acceptance of plaintiffs' asserted interpretation of section 1982 would render the statute unconstitutional and that the standards of liability utilized to deploy such an expanded interpretation would be unconstitutionally vague and indefinite. They argue that a narrow interpretation is compelled so as to sustain the constitutionality of the statute and to prevent the exposure of "a potential actor to some risk or detriment without giving him fair warning of the nature of the

---

6. In analyzing the market shortage confronting plaintiffs the trial judge stated:

   The same economic forces and the law of supply and demand create and destroy markets for building boom towns in time of war and dying ghost towns in time of peace. The same thing occurs in other economic phenomena, such as a gold rush, a uranium strike, a new highway, a railway or the St. Lawrence Waterway. One area is distressed; another is incremented by increased activity.

   The "economic phenomena" referred to by the trial judge have nothing to do with the race of the persons involved; the financial impact upon the citizenry is the same regardless of their color. The impact of the phenomenon of racial discrimination, however, falls solely on the black citizenry.

7. Judge Will accurately depicted the import of section 1982 and the Jones v. Mayer Co. decision when he stated:

   [T]he language and logic of *Jones* and the constitutional application that the Supreme Court regarded as the source of the Civil Rights Act of 1866 must be equally applicable to the discrimination alleged in this case. The Court found that the legislative history of the 1866 Act demonstrated the Congressional intent to ensure that the former slaves could participate fully in a national economy. It was the Court's conclusion that the existence of a black market distinct from a white market was the *de facto* vestige of what the Congress in 1866 intended to abolish as a critical means of making the black man a free man. The conviction recognized was that the obliteration of the social system where one man was the slave of another required as a fundamental matter that our economy be undifferentiated as to the race of a man. The Court thus understood Section 1982 as implementing the Thirteenth Amendment "to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man." 300 F. Supp. at 215.

8. Similar to our ruling in Smith v. Sol D. Adler Realty Co., 436 F.2d 344 (7th Cir. 1970), that race may not be a factor in an apartment rental decision, we now hold that race is an impermissible factor in arriving at the price to be charged for new residential housing. In *Adler* we held:

   In Jones v. Alfred H. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Court held that § 1982 of the Act of 1866, as amended, *supra*, applies to *all* racial discrimination in the sale or rental of property, private as well as governmental. The Court found the language of § 1982 to be plain and unambiguous and that Congress meant exactly what it said, *i. e.*, that "all citizens * * * shall have the same right * * * as is enjoyed by white citizens" to lease real property. We read this to hold that the "same right" means that race is an impermissible factor in an apartment rental decision and that it cannot be brushed aside because it was neither the *sole* reason for discrimination nor the total factor of discrimination. We find no acceptable place in the law for partial racial discrimination. 436 F.2d 349–350 [Emphasis in original].

proscribed conduct." Rowan v. Post Office Dept., 397 U.S. 728, 740, 90 S.Ct. 1484, 1492, 25 L.Ed.2d 736 (1970). Defendants' argument misses the mark for we have not here a penal statute to be strictly construed. Rather, we have a civil statute which is remedial in nature and, as viewed by the Supreme Court, is to be accorded " '. . . a sweep as broad as its language.' " Jones v. Mayer Co., 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968) citing United States v. Price, 383 U.S. 787, 801, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

■ With respect to the standard of liability upon which a violation of the statute may be predicated within the factual context here depicted, we hold that the benchmark for guiding a seller's conduct in the black market is reasonableness. That this is a constitutionally sufficient standard by which to gauge one's conduct in the real estate market was long ago recognized by the Supreme Court in Levy Leasing Co. v. Siegel, 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922). In that case the Court held that the usage of a standard prohibiting " . . . reserving unjust, unreasonable and oppressive" rent and terms of renting was constitutionally definite so as to satisfy the demands of due process. Commenting on the *Levy Leasing Co.* decision, the Court in Small Co. v. American Sugar Refining Co., 267 U.S. 233, 241–242, 45 S.Ct. 295, 298, 69 L.Ed. 589 (1925), stated:

> Real property, particularly in a city, comes to have a recognized value, which is relatively stable and easily ascertained. It also comes to have a recognized rental value—the measure of compensation commonly asked and paid for its occupancy and use—the amount being fixed with due regard to what is just and reasonable between landlord and tenant in view of the value of the property and the outlay which the owner must make for taxes and other current charges.

These are matters which in the course of business come to be fairly well settled and understood. A standard thus developed and accepted in actual practice, when made the test of compliance with legislative commands or prohibitions, usually meets the requirement of due process of law in point of being sufficiently definite and intelligible.

By demanding prices far in excess of a property's fair market value and far in excess of prices for comparable housing available to white citizens the seller ventures into the realm of unreasonableness. The statute does not mandate that blacks are to be sold houses at the exact same price and on the exact same terms as are available to white citizens. Reasonable differentials due to a myriad of permissible factors can be expected and are acceptable. But the statute does now countenance the efforts of those who would exploit a discriminatory situation under the guise of artificial differences.

The practices that have befallen plaintiffs have long besieged other black citizens. In the year 1962 the United States Commission on Civil Rights recognized that:

> Throughout the country large groups of American citizens—mainly Negroes, but other minorities too—are denied an equal opportunity to choose where they will live. Much of the housing market is closed to them for reasons unrelated to their personal worth or ability to pay. New housing, by and large, is available only to whites. And in the restricted market that is open to them, Negroes generally must pay more for equivalent housing than do the favored majority. "The dollar in a dark hand" does not "have the same purchasing power as a dollar in a white hand." [9]

When a seller in the black market demands exorbitant prices and onerous sales terms relative to the terms and prices available to white citizens for comparable housing, it cannot be stated

9. 1961 United States Commission on Civil Rights Report, Part IV, at 1.

that a dollar in the hands of a black man will purchase the same thing as a dollar in the hands of a white man. Such practices render plaintiffs' dollars less valuable than those of white citizens—a situation that was spawned by a discarded system of slavery and is nurtured by vestiges of that system. Courts in applying section 1982 must be vigilant in preventing toleration of this deplorable circumstance.

We hold accordingly that plaintiffs state a claim under section 1982 since they allege that (1) as a result of racial residential segregation dual housing markets exist and (2) defendant sellers took advantage of this situation by demanding prices and terms unreasonably in excess of prices and terms available to white citizens for comparable housing. If the plaintiffs sustain the burden of proof on these elements they make out a *prima facie* case, whereupon, as recently made clear by the Supreme Court, the burden of proof shifts to the defendants "to articulate some legitimate, nondiscriminatory reason" for the price and term differential. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

## II

■ Having determined the substantive framework upon which an action may be brought pursuant to section 1982 we address ourselves to the correctness of the directed verdict entered in favor of the defendants at the close of plaintiffs' case in chief. Keeping in mind that we must view all the evidence, plus the reasonable inferences to be drawn therefrom, in the light most favorable to the plaintiffs, Hannigan v. Sears, Roebuck & Co., 410 F.2d 285, 287 (7th Cir.), cert. denied, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969), we hold that the admitted evidence was sufficient to establish a *prima facie* case under section 1982 pursuant to the exploitation theory of liability and, accordingly, warranted submission of the issues to the jury for resolution. Moreover, we rule that on the basis of the evidence erroneously excluded by the trial judge the plaintiffs have made out a case for section 1982 liability under the so-called traditional theory of discrimination and that, therefore, a directed verdict for defendants on this separate ground was likewise improperly granted. To demonstrate the error committed we proceed to review the evidence adduced at trial.

■ There was sufficient evidence to establish, *prima facie,* the existence of dual housing markets in the Chicago metropolitan area as a result of racial residential segregation. Dr. Karl E. Taeuber, a professor of sociology, testified as an expert witness about the results of his extensive research on the dispersion of population in the city of Chicago. His statistical analysis indicated that Chicago was a highly segregated city and that there was a very high degree of reidential segregation between whites and blacks. Moreover, despite the decrease of white population in the city accompanied by a rapid increase of the black population, the supply of new housing available to whites was much greater than that available to blacks. Also, during the pertinent time period the expanding suburban housing market was limited almost completely to whites. Dr. Taeuber testified that the main obstacle to the movement of blacks into the white areas of Chicago and suburban residential areas was the high degree of discrimination against blacks in the white market. As a result the supply of housing available to whites was far greater in both absolute and relative terms to the supply of new housing available to blacks.

Plaintiffs produced additional proof concerning the existence of dual housing markets through the testimony of another expert witness, Scott Tyler, a real estate broker and appraiser with many years of experience in the real estate business in Chicago. Significantly, defendants seemingly concede the existence of a dual housing market in Chicago. Nor do we think it beyond the strictures of judicial notice to observe that there

exists in Chicago and its environs a high degree of racial residential segregation.[10]

We turn to the second element of the case, whether there was a sufficient *prima facie* showing of an unreasonable differential in price and sale terms between the housing sold or offered by defendants to plaintiffs and comparable housing available to whites. With respect to this phase plaintiffs offered the appraisal testimony of five expert witnesses; the testimony of two, however, was excluded from the jury by the trial judge. Concerning the testimony of Scott Tyler and John Hank which the judge did allow, both witnesses utilized the market data method of appraisal in arriving at a fair market value of a sampling of plaintiffs' homes. The fair market value appraisals were based on sales of comparable homes in all-white neighborhoods which were located in close geographical proximity to plaintiffs' homes and had similar communal amenities such as transportation, schools, churches, and quality of neighborhood. Both witnesses testified that the comparable white housing was sold at prices substantially below the prices commanded by defendants. Expert witness Tyler's appraisals demonstrated that on the average the contract prices charged by defendants exceeded the fair

market value of the homes by $6,508, or 34.5 percent. Expert witness Hank was of the opinion that on the average defendants' prices exceeded fair market value by $4,209, or 20.6 percent. Plaintiffs adduced additional appraisal testimony from Paul Underwood who had been an appraiser for a savings and loan association which had loaned money to one of the defendant land companies for construction of houses sold to plaintiffs. Pursuant to this financing arrangement Underwood appraised thirty of defendants' houses for which he testified that the sales price charged by defendants, on the average, exceeded fair market value by $4,296, or 20.9 percent.[11] Based on the foregoing we think a jury could reasonably reach the conclusion that defendants' price differential was unreasonably in excess of fair market value and prices available to white citizens for comparable housing. Accordingly, there was sufficient evidence on the price differential to send the case to the jury.

Turning to the issue of the reasonableness of the sale terms differential the evidence at trial indicated that defendants refused to sell other than on land contract to plaintiffs.[12] There was testimony to the effect that defendants refused to participate in any sales

---

10. A recent study by the Council on Municipal Performance indicates that of the thirty largest cities in the United States Chicago is the second most segregated. *See* Vol. 1, No. 2 Municipal Performance Report, November 1973, at 16–18.

11. The trial court improperly excluded appraisal evidence of Walter Tomlinson and Francis Parker. *See, e. g.*, Illinois Power & Light Co. v. Talbott, 321 Ill. 538, 543, 152 N.E. 486 (1926). Tomlinson and Parker were employed by savings and loan institutions and as a consequence thereof they had appraised certain of defendants' constructions, for the purpose of extending construction mortgage funds. Tomlinson was of the opinion that defendants' sales prices were, on the average, $4,099 or 20.4 percent in excess of appraised value while Parker's appraisals reflected an average excess of $3,729 or 16.6 percent over the fair cash market value of the respective houses.

12. A pre-printed form installment sales contract was used setting forth the total sales price, the deferred balance after down payment, the minimum monthly principal and interest payment, and the interest rate. None of the contracts specified the term over which payments were to be made. The average contract term was 28 years; some terms ranged upwards to 40 or more years. The contracts prohibited installation of improvements such as storm windows, fences, patios, and garages, unless prior permission was obtained from the land company. Title to the real estate was retained by the land company until the entire amount of the deferred balance was satisfied. Upon default and repossession the land companies were permitted to retain the entire amount which the contract purchaser had paid on the property and any improvements.

through a deed and mortgage arrangement despite the prospective buyer's ability to obtain mortgage financing. The evidence indicates that plaintiffs were of the equivalent economic status as many whites who routinely obtained mortgages to finance the purchase of houses and that a competing construction company in the black market sold the vast majority of its homes on deed and mortgage to blacks similarly situated economically to plaintiffs. Also, the evidence demonstrates that some plaintiffs made down payments of up to forty-five percent of the contract price— well above the amount needed to qualify for mortgages—and yet defendants refused to deal on terms other than contract.[13] On the basis of this evidence it could reasonably be inferred that defendants utilized the contract method of sales to facilitate their exorbitant pricing practices[14] and not because of significant differences between plaintiffs' economic status and that of whites similarly situated who were able to utilize mortgage financing. Hence, a jury could find that the different treatment accorded plaintiffs by defendants' sales terms was discriminatory.

Furthermore, plaintiffs offered evidence, which was erroneously excluded by the trial judge, sufficient to establish a *prima facie* case pursuant to the traditional theory of discrimination. Under that theory there must be a showing of "treating, in similar circumstances, a member or members of one race different from the manner in which members of another race are treated." Love v. DeCarlo Homes, Inc., 482 F.2d 613, 615 (5th Cir. 1973). That is, a black prospective buyer of a dwelling demonstrates discriminatory conduct if he proves that an owner utilizes different pricing policies with respect to blacks and whites similarly situated.

■ The proffered evidence which was rejected at trial involved the sales of new houses to white buyers in Deerfield, Illinois and Park Forest South, Illinois, both being suburban residential developments. The sellers of the houses in Deerfield were Universal Construction Company and a joint venture comprised of the Deerfield Home Development Company and Universal Builders, Inc., while the houses in Park Forest South were sold by the P. F. S. Development Company. The plaintiffs contended that these corporations were owned and managed by the same persons that owned and managed defendants and that these persons were engaged in discrimi-

---

13. In a letter to a Chicago savings and loan association which advanced construction mortgage money an officer and owner of defendants boasted of the large down payments being made by the contract purchasers proclaiming them to be " . . . substantially above that current in the trade." Despite this and other indicia of financial stability exhibited by plaintiffs, the defendants insisted on the contract method of sales to the exclusion of mortgages.

It is also worthy of note that defendants offered no incentive to the contract purchaser to pay off the balance immediately. The notion that contract buyers must pay higher prices because the seller assumes the risk of nonpayment was admitted by defendants not to be applicable to plaintiffs; defendants' contract prices being the same as if the sales were cash. The sales prices under installment contracts were the same as they would have been if for cash or through mortgage financing.

14. Mr. Justin Hulman, a former Illinois Commissioner of Savings and Loan Associations, testified for plaintiffs with respect to the direct relationship between fair housing prices and mortgage availability. Mr. Hulman indicated that it was the practice of lending institutions during 1959 to 1969 to make mortgages of up to 90 percent of the appraised value of the property, the difference being the down payment. As the sales price increases relative to the appraisal value of a home the disparity—as reflected in the amount of the down payment—becomes more apparent and the availability of mortgage money lessens. By forcing plaintiffs to purchase on contract the defendants kept plaintiffs ignorant of the appraised value of the properties and the great disparity between fair market value and the sales price. Sales on contract avoided intervention by mortgage lending institutions and the certain disclosure by the institutions of the disparity between sales price and appraised value. To that extent the contract method of sales facilitated defendants' exorbitant pricing practices.

natory conduct through the use of different pricing practices in Deerfield and Park Forest South from those used in pricing defendants' houses. The trial judge excluded the evidence on two grounds: (1) the plaintiffs were not allowed to disregard the separate identities of the three corporations and (2) the lack of a basis of comparability for homes in Deerfield and Park Forest South with those of plaintiffs in Chicago. We rule that the trial court erred in excluding plaintiffs' evidence on the Deerfield and Park Forest South pricing policies.

■ Defendants' argument that the corporate formalities should not be disregarded in the context of the issues is without worth. As this court has stated, corporate formalities "may be disregarded in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." Ohio Tank Car Co. v. Keith Ry. Equip. Co., 148 F. 2d 4, 6 (7th Cir. 1945), cert. denied, 326 U.S. 730, 66 S.Ct. 38, 90 L.Ed. 434 (1945). In situations such as here, where common ownership and management exists, corporate formalities must not be rigidly adhered to when inquiry is made of civil rights violations. Accordingly, the objection raised by defendants presents no obstacles to the comparison of defendants' pricing policies in Chicago with the pricing policies implemented in Deerfield and Park Forest South by the other selling organizations.

■ Turning to the second reason given for excluding the Deerfield and Park Forest South evidence we find that there was sufficient comparability between those operations and defendants' sales in the relevant black market so as to render the exclusion an abuse of discretion. Factors such as geographical proximity, the date of the sale, type of construction, and materials used are factors going only to the weight to be accorded the evidence by the jury and do not go to its admissibility. *See, e. g.,* Winston v. United States, 342 F.2d 715, 721 (9th Cir. 1965); United States v. 124.84 Acres of Land, Warrick County, Ind., 387 F.2d 912 (7th Cir. 1968). Plaintiffs met the requirement of sufficient comparability through the use of a comparative statistical analysis of accounting data reflecting defendants' sales operations and pricing policies in Chicago with those of Deerfield and Park Forest South. We find plaintiffs' statistical evidence to have been sufficiently competent; *see* United States v. Certain Interests in Property, etc., 326 F.2d 109 (2d Cir. 1964), cert. denied, 377 U.S. 978, 84 S.Ct. 1884, 12 L.Ed.2d 747 (1964), and probative of plaintiffs' claim that defendants sold houses to blacks on price terms different from those they sold to white buyers similarly situated. Indeed, as the Eighth Circuit has stated, "statistical evidence can make a prima facie case of discrimination." Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1972), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).[15]

Plaintiffs' expert witnesses testified that in the housing industry prices are established on the basis of direct costs, consisting generally of the investment in the land and the cost of construction, including materials. Once the direct costs are calculated, an allowance for overhead and profit is added to the direct costs to attain the sales price. The allowance for overhead and profit is the gross profit on sales which plaintiffs' expert witness testimony indicated was generally found in the real estate industry to be from fifteen to nineteen per-

---

15. Defendants' claim that the statistical evidence comparing the suburban and Chicago operations should properly be excluded as it was not within the contemplation of plaintiffs' pleadings. We find such an assertion to be without merit. *See* Conley v. Gibson, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). It would appear that through discovery and other pre-trial procedures defendants were clearly apprised of plaintiffs' theory of the case and the evidence pertaining to it.

cent of the sales price.[16] Defendants testified to the utilization of this method of pricing in their sales to plaintiffs; however, the statistical evidence presented by plaintiffs tends to refute that assertion.[17]

Viewing the evidence, first in absolute terms, it shows that defendants' pricing policy in Chicago produced an average gross profit substantially in excess of that produced by the Deerfield and Park Forest South operations.[18] In relative percentage terms defendants reaped a gross profit of 27.6 percent of sales, well above the industry figure of 14 to 19 percent and considerably in excess of the gross profit percentages of the Deerfield and Park Forest South operations.[19] Second, analyzing the same data in terms of the mark-up of the sales price over the direct costs, it is clear that the mark-up—as a percentage of direct costs—was much higher in the sales to plaintiffs than in the sales to white buyers in Deerfield and Park Forest South.[20]

The statistical evidence substantiates the claim that defendants priced plaintiffs' houses much higher relative to direct costs than the houses sold in Deerfield and Park Forest South and belies any contention that defendants utilized

16. To the extent that differences in land location and building materials affect sales price, those differences are reflected in the absolute amount of direct costs. The differences do not affect the pricing methods employed. That is, the expert testimony and defendants were agreed that the type of house or area in which it is built does not affect the method of setting prices. The selling price is arrived at by establishing direct costs and adding an amount for overhead and profit. The amount added for overhead and profit represents the gross profit and is an important comparative figure in analyzing the substance of the pricing methods employed by defendants.

17. Plaintiffs' statistical evidence was prepared by John Royer, an independent certified public accountant. To assure a substantial basis for statistical comparability between the Chicago and suburban operations, Royer made appropriate adjustments for differences in accounting methods and financial presentations between the various operations. Moreover, with respect to percentage comparisons of gross profit and mark-up, Royer testified that before calculating such percentages he determined that the components of direct costs were the same for the suburban companies as for the defendant companies.

18. In those instances where direct costs were comparable in absolute amounts, the gross profit garnered by defendants was substantially in excess of that obtained in the suburban operations. For example, the following chart compares the operations of Universal Construction Co. in Deerfield with defendants' efforts in Chicago:

|  | (1)<br>Universal<br>Construction<br>Company | (2)<br>Chicago<br>Operation | (3)<br>Difference<br>(Column<br>2 Minus 1) |
|---|---|---|---|
| Average Sales Price | $ 22,644.60 | $25,172.53 | $ 2,527.93 |
| Average Direct Costs<br>(Land Plus Building) | $ 18,779.45 | $18,246.14 | $ –553.31 |
| Average Gross Profit | $ 3,865.15 | $ 6,926.39 | $ 3,061.24 |

Although the average direct costs were slightly lower in the Chicago operations, the average sales price and average gross profit were substantially higher in those operations than in the Deerfield operations.

19. In Deerfield, Universal Construction realized a gross profit of 17.1 percent while the gross profit of the Deerfield Home-Universal Builders joint venture was 17.6 percent. The operations in Park Forest South turned an average gross profit of 15.5 percent of sales price.

20. The average mark-up or ratio of gross profit to direct costs was 20.58 percent for Universal Construction while the Deerfield Home joint venture operations reflected a mark-up of 21.42 percent; the mark-up in Park Forest South was 18.35 percent. In contrast, defendants' mark-up on their sales to plaintiffs averaged 37.96 percent.

comparable pricing policies in their sales to plaintiffs. Plaintiffs presented Dr. Richard Freeman, a Professor of Economics, who analyzed the statistical data pertaining to the difference in gross profits between defendants' sales to plaintiffs and the suburban operations. His analysis demonstrated that the difference in pricing practices was due to the race of the buyer and not economic factors.[21]

In summary, it is difficult as a *prima facie* matter to infer that the substantial disparity between the pricing practices of defendants in the black real estate market and the pricing practices in the white market was attributable to some factor other than the race of the buyers. Whether defendants afforded plaintiffs the "same right" to purchase housing as offered white buyers was, based on the foregoing evidence, an issue to be properly submitted to the jury.

### III

Plaintiffs also raise numerous procedural issues arising out of the course of this protracted litigation. They claim that the district court erred in: (1) denying plaintiffs' motion to amend their complaint by adding additional defendants; (2) requiring class members af-firmatively to request inclusion as plaintiffs; (3) dismissing with prejudice class members who failed to answer interrogatories or to appear for depositions; (4) the method of disposing of the second count of defendants' amended counterclaim; and (5) erred in the assessment of costs against plaintiffs.

One month prior to when the trial was scheduled to begin and four months before its actual commencement the plaintiffs moved under Fed.R. Civ.P. 15(a) to amend their complaint adding as parties defendant certain persons who were the principal officers, directors, and shareholders of the defendants.[22] The district court denied plaintiffs' motion on the ground that it was not timely. We are not convinced that plaintiffs' motion would have delayed the trial. Moreover, absent a showing of prejudice, a mere delay in the commencement of the action should not ordinarily operate to preclude a motion to amend the complaint. *See* Middle Atlantic Utilities Co. v. S. M. W. Development Co., 392 F.2d 380, 384 (2d Cir. 1968). Plaintiffs' requested amendment would not have prejudiced the defendant corporations nor the persons sought to be added to the action as defendants. Those persons, as officers, di-

---

21. Dr. Freeman teaches econometrics—the analysis of statistical materials in economics —and specializes in the subject of the economics of discrimination against blacks. Dr. Freeman analyzed the evidence elicited by plaintiffs and rendered an interpretative opinion thereof. The trial judge excluded Dr. Freeman's testimony on the ground that it invaded the province of the jury because "discrimination is not a technical matter." It can hardly be gainsaid that interpretation and analysis of this elaborate statistical evidence is something more than a nontechnical matter, or that the discrimination alleged surpasses the niche of simplicity. Nor do we perceive an inability on the part of the jury to appropriately appraise Dr. Freeman's testimony and attribute to it whatever worth and weight of which it is deserving. Keeping in mind our recent enunciation that there is a "presumption that informed opinion will be admitted," United States v. Dellinger, 472 F.2d 340, 383 (7th Cir. 1972), we hold that the trial judge erred in prohibiting

Dr. Freeman to testify before the jury. United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943).

The sum of Dr. Freeman's testimony, as indicated, was that the differences in gross profits—that is, the difference in defendants' performance in the white and black housing markets—was due to racial factors. In addition, Dr. Freeman testified as to the import of plaintiffs' economic data pertaining to their exploitation theory of liability. On the basis of his analysis, Dr. Freeman was of the opinion that the difference between defendants' sales prices and the fair market value of the houses and prices charged white citizens for comparable housing was due in large part to race.

22. Rule 15(a) provides that after the answer is filed the plaintiff may amend his complaint " . . . only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

rectors, and shareholders of the closely held defendant corporations were on constructive notice of the action and indeed were active participants in it since its inception. Under these circumstances it was error to not grant plaintiffs leave to amend. *See* Gifford v. Wichita Falls and Southern Ry. Co., 224 F.2d 374, 376 (5th Cir. 1955), cert. denied, 350 U.S. 895, 76 S.Ct. 153, 100 L.Ed. 787 (1955).[23]

■ Plaintiffs next contend that it was error for the trial judge to require members of the plaintiff class to request inclusion in the class. Pursuant to Fed. R.Civ.P. 23, Judge Will ordered that all class members be notified that they would be included in the class unless they expressly requested exclusion. When the case came before Judge Perry a second notice was ordered to be sent to the plaintiffs advising them that unless they affirmatively requested inclusion in the class they would be excluded. It cannot be doubted that the sending of this second and conflicting notice was confusing to a class member and was an unsound practice. Moreover, the requirement of an affirmative request for inclusion in the class is contrary to the express language of Rule 23(c)(2)(B) that "the notice shall advise each member that . . . the judgment, whether favorable or not, will include all members who do not request exclusion." In light of the confusion created by the conflicting notices and the clear language of Rule 23(c)(2)(B), the trial court erred in ordering the second notice requiring an affirmative response for

inclusion. *See* Korn v. Franchard Corp., 456 F.2d 1206, 1210 (2d Cir. 1972). Accordingly, all members who did not request exclusion are proper parties to the judgment in this action.

■ Addressing ourselves to the issue of the propriety of dismissing with prejudice class members who failed to answer interrogatories or appear for depositions, we think the district judge erred. In Brennan v. Midwestern United Life Ins. Co., 450 F.2d 999 (7th Cir. 1971), cert. denied, 405 U.S. 921, 92 S. Ct. 957, 30 L.Ed.2d 792 (1972), we held that in appropriate circumstances absent class members may be propounded written interrogatories on a showing that the information requested is necessary to trial preparation and that the interrogatory is not designed "as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants." 450 F.2d at 1005. The party seeking discovery has the burden of demonstrating its merits.

With respect to the written interrogatories propounded in the case at bar we fail to discern any attempt by the trial court in reaching a determination as to whether the information sought was necessary, or whether the interrogatories were a mere stratagem to diminish class membership. There was no showing on the merits of defendants' request. More important, in view of the substantive nature of the questions propounded we do not believe that defendants could have met the burden of demonstrating the meritorious nature of their request.[24]

---

23. The defendants claim that the addition as defendants of the officers and shareholders of the defendant corporations would be an improper failure to adhere to the corporate formalities and separate identity. In our prior statement rejecting this contention we referred to our decision in Ohio Tank Car Co. v. Keith Ry. Equipment Co., 148 F.2d 4, 6 (7th Cir.), cert. denied, 326 U.S. 730, 66 S.Ct. 38, 90 L.Ed. 434 (1945), where we held:

The general rule that a corporation and its stockholders are deemed separate entities is subject to the qualification that the separate identity may be disregarded in exceptional situations where it otherwise

would present an obstacle to the due protection or enforcement of public or private rights.

The concept of separate identity between shareholders and their corporations is not sacrosanct. It demands even lesser respect when it becomes clear that the corporation is used as a vehicle to violate the civil rights of others. The instant action is an "exceptional situation" sufficient to justify disregard of the corporate identities, as we have already ruled.

24. The interrogatories sought answers to questions that would have required the assistance of technical and legal advice in un-

The taking of depositions of absent class members is—as is true of written interrogatories—appropriate in special circumstances. And, not unlike the use of interrogatories, the party seeking the depositions has the burden of showing necessity and absence of any motive to take undue advantage of the class members. However, in light of the nature of the deposition process—namely, the passive litigants are required to appear for questioning and are subject to often stiff interrogation by opposing counsel with the concomitant need for counsel of their own—we are of the view that the burden confronting the party seeking deposition testimony should be more severe than that imposed on the party requesting permission to use interrogatories. The record in this action is devoid of any showing that defendants met that burden.

The plaintiffs contend that the district court erred in its disposition of the second count of defendants' counterclaim. At the time the directed verdict for defendants was granted the district court, with defendants' consent, ordered dismissal of defendants' counterclaim subject to automatic reinstatement in the event plaintiffs appealed from the district court's grant of directed verdict for defendants. Plaintiffs urge this conditional dismissal was improper and that the counterclaim should be dismissed with prejudice and without qualification.

We agree with plaintiffs that dismissal subject to reinstatement if plaintiffs appealed was a highly improper attempt at coercing plaintiffs into waiving their right to appeal and as such was error. *See, e. g.,* Worcester v. C. I. R., 370 F.2d 713, 718 (1st Cir. 1966); North Carolina v. Pearce, 395 U.S. 711, 724, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In addition, the record indicates that, contrary to defendants' as-

sertion, plaintiffs' objection to this conditional dismissal was timely.

Defendants' counterclaim does not arise "out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." Fed.R.Civ.P. 13(a). The counterclaim invokes matters unrelated to plaintiffs' civil rights claims, involving alleged tortious acts by certain of the plaintiffs which acts are claimed to have begun in 1968, post-dating the violations of plaintiffs' civil rights by as much as ten years. Therefore the counterclaim was permissive under Fed.R.Civ.P. 13(b), rather than compulsory and as such must be supported by federal subject matter jurisdiction independent of the jurisdiction supporting plaintiffs' complaint. Diamond v. Terminal Railway Alabama State Docks, 421 F.2d 228, 235–236 (5th Cir. 1970). There is here no discernible independent federal jurisdiction over defendants' proffered counterclaim; accordingly it should have been dismissed with prejudice.

Lastly, plaintiffs take issue with the trial judge's statement on assessment of costs:

> I am taking the matter of apportioning costs under advisement. If there is no appeal, I expect to order each of the parties to bear their own respective costs. If there is an appeal, I will enter the order as I see fit, in accordance with the law.

In response to an inquiry by plaintiffs' counsel, the trial judge commented that, "there would be no costs assessed against those who do not appeal."

Although the district court has discretionary power to assess costs, the action it took was improper and clearly an abuse of discretion. As we previously indicated, any attempt by a court at preventing an appeal is unwarranted and cannot be tolerated. The

---

derstanding the questions and formulating responsive answers thereto. Indeed, certain of the questions pertained to allegations that were proved at trial through the use of ex-

pert witnesses. In addition, some of the interrogatories sought information on matters already known to defendants.

separate order of the district court on costs is reversed and, pursuant to Fed. R.Civ.P. 54(d), each side is directed to bear its own costs.

We reverse the judgment of the district court and remand for a new trial under Circuit Rule 23.