SHAD UR, District Judge,
Dissenting in part:
What has been said in the majority opinion may properly be viewed as having put forth the best possible case for affirmance of the District Court’s dismissal of the Black Smokers’ Second Amended Complaint (“Complaint”). But that presentation, I believe, has despite itself highlighted the basic flaws in such a threshold Fed.R.Civ.P. (“Rule”) 12(b)(6) dismissal. Accordingly I dissent from the portion of the majority opinion that rejects Black Smokers’ claims under Sections 1981, 1982 and 1985(3) at the threshold of the ease.[1]
Both the panel majority and I necessarily proceed from the seminal statement in Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) of *807 the quite undemanding burden that Rule 12(b)(6) imposes on a plaintiffs complaint:
A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with .the allegations. Conley v. Gibson, 355 U.S. 41, 45^46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).
And the majority opinion also correctly recognizes, though I fear it does not fairly apply, the proposition that all reasonable inferences that can be drawn from the allegations in the Complaint, as well as the allegations themselves, must be accepted as true (Moore v. Tartler, 986 F.2d 682, 685 (3d Cir.1993)).
Because we deal with a Complaint whose allegations must thus be credited, there is no need to dwell at length on the appalling record disclosed by Black Smokers’ pleading. Their-110 page 211-paragraph Complaint does not comport with the Rule 8(a)(2) requirement of “a short- and plain statement of the claim showing that the pleader is entitled to relief,” but they can scarcely be faulted for what would normally be viewed as overkill in light of the undue judicial skepticism with which their effort has been met. It is sufficient for present purposes to refer to the substantially higher carcinogenic effects of the tobacco companies’ mentholated products, the use of which an extensively quoted 1998 Surgeon General’s report and other medical research discloses as having led to a much higher rate of lung cancer, pharyngeal cancer and other malignancies among Blacks (Complaint ¶¶ 80-91),' phenomena that had been confirmed by the tobacco companies’ own significant research (which the companies had suppressed). And the Complaint further alleges that despite that knowledge, the companies nevertheless engaged in extensive conduct that adversely impacted on Black Smokers {id. ¶¶ 48, 63), even including the actual design and introduction (though it was then abandoned in the face of public outrage) of a mentholated product expressly for Blacks {id. ¶ 45.c).
In that light, where I first part company with the majority opinion is in its having ruled as a matter of law “that Black Smokers’ allegations of racially targeted marketing of mentholated tobacco products cannot, in the absence of any disparity between the products sold to African-Americans and the products sold to others, constitute a deprivation of contract or property rights actionable under §§ 1981 or 1982.” And my departure from that unsupportable proposition flows directly from the straw man first erected by the majority opinion when it says:
Black Smokers do not make the sort of claim that is most readily actionable under the statute: that they have been deprived by defendants of the right to contract for, purchase, own or use either menthol or non-menthol cigarettes.
What must be understood instead is that both Section 1981 and Section 1982 are not at all limited by their terms to the outright deprivation of the Black community’s right to contract. Instead each of those statutes mandates an equal playing field that is violated by conduct that imposes different and race-discriminatory conditions (however created) on the exercise of seemingly comparable contractual rights: Section 1981 guarantees to Black Smokers “the same right ... to make ... contracts ... as is enjoyed by white citizens,” while Section 1982 assures to Black Smokers “the same right ... as is enjoyed by white citizens ... to ... purchase ... personal property.” And that is the gravamen of the Complaint — that by the tobacco companies’ deliberate and successful targeting of Black Smokers to persuade them to purchase and smoke the concededly more dangerous menthol cigarettes and smoke *808 less tobacco — conduct whose actionability is akin to the prohibition of actual “steering” under the Fair Housing Act — those companies have impaired that equality of rights.
Nor should it avail the tobacco companies to attempt to trot out “freedom 'of contract” principles. On the uncontested allegations of the Complaint, they have deliberately suppressed the added perils created by the mentholated products, concealing them from Black Smokers. And it just will not do for the tobacco companies to argue that they are somehow equal opportunity deceivers — that they have betrayed Whites and Blacks alike by their deception. When their alleged concealment of the known risks (known to them, that is) is coupled with their express efforts to maximize the sales of mentholated coffin nails and mentholated smokeless tobacco to Blacks, the inequality of treatment forbidden by Sections 1981 and 1982 is demonstrated by the fairly-read Complaint.
And this is not at all speculative. Defendants’ repeated (and it must be said hypocritical) emphasis on the fact that 69% of the mentholated products are used by non-Blacks is as deceptive as their historical conduct of denying the extraordinarily harmful effects of nicotine generally and of menthol in particular. What that repeated emphasis glosses over is the enormous disparity between the 10+ % of the population represented by Blacks and the Black Smokers’ 31%[2] consumption of the menthol cigarettes. It will be recalled that the rule of thumb for demonstrating discrimination has been recognized in these terms for a quarter century (Castaneda v. Partida, 430 U.S. 482, 496-97 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1976)):
As a general rule for such large samples, if the difference between the expected value and the observed number is more than 2 or 3 standard deviations, then the hypothesis that the difference was random will be suspect to a social scientist.
Two standard deviations equate to a 5% likelihood of chance distribution. And by contrast the probability that a 10% versus 31% disparity is a matter of mere chance represents, as an approximation (and essentially a conservative one) of the normal distribution, some 7 standard deviations— producing a figure so small as to beggar the imagination: 1.28 in a trillion.[3]
That extraordinary imbalance (truly an understatement, for such a huge disparity is almost beyond human comprehension) really cuts the legs out from under the majority opinion’s attempt to distinguish .the decision in Roper v. Edwards, 815 F.2d 1474 (11th Cir.1987) by stating:
One might argue that if racially directed marketing of menthol cigarettes resulted in a situation in which virtually all mentholated tobacco products were consumed by African-Americans and substantially all non-mentholated tobacco products by others, that case might come within the sweep of Roper. However, Black Smokers have not alleged such a situation.
In real world terms there is no conceptual difference between the notion that “virtually all mentholated tobacco products were consumed by African-Americans” and the situation in which that group’s comparative consumption is so close to 100% of total *809 consumption in the meaningful statistical sense.
It is surely unreasonable to ascribe such an enormous disparity to chance rather than to the purposeful steering that has been alleged by Black Smokers — at a minimum, they should be allowed their day in court to prove that racial animus may reasonably be inferred from the tobacco companies’ deliberate targeting of African-Americans as their far-preferred targets of the more dangerous products at issue. There is no question that even the far, far smaller but still statistically significant disparity of two standard deviations suffices to warrant an inference of intentional discrimination — see, e.g., such eases as Smith v. Xerox Corp., 196 F.3d 358, 365-66 (2d Cir.1999).
Nor I suggest will it do (as the tobacco companies have urged and as the majority opinion has cr edited) to say that Black Smokers cannot complain about that deliberate steering because Blacks were already predisposed to prefer the mentholated products. We are after all dealing with the case at its very outset. Nothing has been shown — because no opportunity has been given to Black Smokers — as to whether that preference was itself the product of the same kind of improper steering at the outset, or even if not, as to whether the earlier preference even began to approach (let alone to account for) the enormous disparity that now exists (a showing that might for example be accomplished, again to deal with statistical probabilities, through the application of multiple regression analysis).
In response to Black Smokers’ uncontro-verted allegations about the tobacco companies’ purposeful steering of their known extra-harmful mentholated products to the African-American market, the majority opinion accepts the argument that this was no more than conventional advertising, something that Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) characterized as non-actionable under Section 1982. But Jones v. Mayer, id. said only this in the course of announcing for the first time that Section 1982 applies to private as well as public racial discrimination in the sale of property (a statement made in the course of contrasting that statute with the full-bore open housing law that was then brand new on the books):
It [Section 1982] does not prohibit advertising or other representations that indicate discriminatory preferences.
That sanitization of mere statements of discriminatory preferences does not control her e, however, for when such discriminatory preferences are translated into discriminatory action, as is alleged her e (and as we must credit), the actor cannot fairly be insulated from the impact of Section 1982 (or of Section 1981) by asserting that its advertising was a means by which it accomplished that forbidden end.
Indeed, that is precisely the thrust of the eloquent opinion by the late Judge Luther Swygert in Clark v. Universal Builders, 501 F.2d 324 (7th Cir.1974), which found support rather than a lack of support in Jones v. Mayer, but which the majority opinion seeks to distinguish because the sales of housing to Black purchasers in Clark were on more onerous terms than the sales to non-Blacks. But once again I suggest that the attempted distinction is hollow — that defendants’ conduct set out in the Complaint in this case effectively created the same type of separate, racially-segregated market as was found actionable in Clark. Such cases as Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1525, 1529 (7th Cir.1990) teach that racial steering is forbidden both by Section 1982 and by the Fair Housing Act (each of which was implicated there) — and of *810 course Section 1982 is not limited to anti-Black discrimination in housing, as is the Fair Housing Act.[4]
Finally, what of the required showing of racial animus? Is it a defense for the tobacco companies to urge that their pattern of general concealment and deception reflected nothing more than a free market desire to make profit, and that their targeting of Black Smokers was nothing more than a desire to maximize those • profits because the Blacks were most vulnerable to the most deleterious products? Again, unlawfully discriminatory intent under the discrimination laws generally has been recognized as reasonably inferable from far less evidence of disparate impact — should any different principle apply here? Once more the tobacco companies’ callous indifference to smokers’ health has been demonstrably more marked toward Black Smokers — that is the combined effect (1) of the tobacco companies’ knowledge (and their concealment of that knowledge)about the special deadliness of the mentholated products ■ that they have been marketing and (2) of their express targeting of those products toward the African-American community.
It is not of course my purpose to express any conclusion as to the existence or nonexistence of the prohibited intent. Instead the focus of this opinion is to stress the requirement that, as with all other factual issues, intent must be resolved by a factfinding jury (or perhaps by a judge in the summary judgment context of Rule 56, rather than at the preliminary pleading stage under Rule 12(b)(6), where plaintiffs’ allegations must be accepted as true). And to that end I find it particularly poignant that we deal here with a group of defendants whose industry is centered in an area where Blacks were once chattels, viewed as subhuman — again ironically in terms of the present litigation, chattels whose slave labor was responsible in large part for the economic success of the tobacco industry. Even though a century and a half has elapsed since that mindset was supposed to have been eliminated by the Civil War and by the post-War Civil Rights Acts (including Sections 1981 and 1982), all of us know that the reality of racial prejudice has unfortunately long outlived the theory embodied in those statutes. Whether any such prejudice has been at work here should not, I believe, be resolved on a threshold determination of the likelihood or unlikelihood of Black *811 Smokers’ ability to prove their allegations in that respect.
We would do well to remember what Justice O’Connor (speaking for a unanimous Supreme Court on this issue) said in rejecting the threshold dismissal of a pro se prisoner’s complaint because of a judicial view that its allegations were unlikely (Denton v. Hernandez, 504 U.S. 25, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992)):
Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be “strange, but true; for truth is always strange, Stranger than fiction.” Lord Byron, Don Juan, canto XIV, stanza 101 (T. Steffan, E. Steffan, & W. Pratt eds. 1977).
Black Smokers are surely entitled to no less, where their factual assertions are so solidly supported (and not in the least fanciful), and where the perceived problems with their Complaint really represent skepticism as to their ability to prove causation and intent' — classic issues of fact to be resolved by a factfinding jury and not by judicial prescreening.
In sum, I suggest that cutting Black Smokers off before they have had the opportunity to demonstrate that they can deliver as advertised[5] in their Complaint does violence to the fundamental principles of judicial reading of complaints, as acknowledged both in the majority opinion and in this dissent. Accordingly, I respectfully dissent in the respects spoken of here.

. Because I agree that there is no predicate for ascribing stale actor or federal actor status to the tobacco companies or the other defendants, I concur in the majority’s rejection of Black Smokers' claims under Section 1983 and under the Bivens line of authority. And while speaking of the other defendants, to simplify the ensuing discussion I will refer solely to the defendant tobacco companies, for in my view any sorting out among the defendants ought to be done by the district court on remand in light of what is said here.

. As the majority opinion indicates, 31% is the most charitable (to the tobacco companies) of the numbers reflected by statistics cited in the Complaint. Other studies put that number as high as 61.5% and 66%.

. That figure is derived from William Knight, Tables of the Normal Distribution, at http:// www.math.unb.ca/ knight/utility/NormTble. him.

. Even brief reflection on what Jones v. Mayer did not say, as well as on what it did say, demonstrates that the majority opinion loads that opinion's single sentence quoted above with more baggage than it can reasonably carry. Just as there is nothing actionable (for example) in the seller of clothing deciding that it wishes to expand its market by depicting Black as well as White models in its clothing ads, so too a mere indication of racial preferences in advertising is not actionable as such under Section 1982. But what I believe is just as obviously prohibited by that statute is using such advertising to deny Blacks the same treatment as Whites — -the rights to contract and to purchase under the same conditions — by deliberately subjecting Blacks to the far greater impact of the seriously (often fatally) deleterious effects of the advertised product — effects well known to but undisclosed by the tobacco companies. And as for the majority opinion's effort to distinguish Clark v. Universal Builders, it is necessarily apparent (though it was undiscussed because not placed into issue there) that the Black purchasers in that case were the victims of sales of substandard housing — in violation of Section 1982 — that had to be accomplished through advertising. After all, the alternative premise of assuming that those sales were spontaneously generated would require turning the aphorism credited to Emerson on its head to read:
If a man can make a worse mouse-trap than his neighbor, though he builds his house in the woods the world will make a beaten path to his door.

. Admittedly a bad pun.