

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-2001

# Brown v. Philip Morris Inc

Precedential or Non-Precedential:

Docket 99-1931

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Brown v. Philip Morris Inc" (2001). *2001 Decisions.* Paper 107.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/107

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 17, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1931

JESSE BROWN, REV., ON BEHALF OF HIMSELF AND
ALL MEMBERS OF THE UPTOWN COALITION FOR
TOBACCO CONTROL AND HEALTH; AARON ELEAZER;
PANSY SMITH; ELLEN IRVING; NATIONAL ASSOCIATION
OF AFRICAN AMERICANS FOR POSITIVE IMAGERY , INC.,

      Appellants

v.

PHILIP MORRIS INC.; BROWN AND WILLIAMSON
TOBACCO CORPORATION; B.A.T. INDUSTRIES;
LORILLARD TOBACCO COMPANY INC.; THE AMERICAN
TOBACCO COMPANY; UNITED STATES TOBACCO
COMPANY; THE COUNCIL FOR TOBACCO RESEARCH
U.S.A., INC.; THE TOBACCO INSTITUTE, INC.;
SMOKELESS TOBACCO COUNCIL, INC.; HILL &
KNOWLTON, INC.; RJR NABISCO HOLDINGS CORP .; R.J.
REYNOLDS TOBACCO COMPANY; LIGGETT GROUP INC.;
LIGGETT & MYERS TOBACCO COMPANY

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 98-cv-05518)
District Judge: Honorable John R. Padova

Argued January 19, 2001

Before: ROTH and BARRY, Cir cuit Judges, and
SHADUR,* District Judge
_____

* Honorable Milton I. Shadur, District Court Judge for the Northern
District of Illinois, sitting by designation.

(Opinion filed: May 17, 2001)

Bruce M. Ludwig, Esquire (Argued)
William R. Adams, Jr., Esquire
 (Argued)
Sheller, Ludwig & Badey
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102

Black & Adams
123 S. Broad Street, Suite 1820
Philadelphia, PA 19109

 Attorneys for Appellants

Jeffrey G. Weil, Esquire (Ar gued)
Michael F. R. Harris, Esquire
Matthew S. Miner, Esquire
Alan C. Promer, Esquire
Dechert, Price & Rhoads
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA 19103

 Attorneys for Philip Morris
Incorporated

Christopher S. D'Angelo, Esquire
Montgomery, McCracken, Walker &
 Rhoads
123 South Broad Street
Philadelphia, PA 19109

 Attorneys for B.A.T. Industries

Howard M. Klein, Esquire
William J. O'Brien, Esquire
Conrad, O'Brien, Gellman & Rohn
1515 Market Street, 16th Floor
Philadelphia, PA 19102

 Attorneys for Lorillard Tobacco
Company

2

Stephen J. Imbriglia, Esquire
Hecker, Brown, Sherry & Johnson
18th & Arch Streets
1700 Two Logan Square
Philadelphia, PA 19103

 Attorneys for US Tobacco
Company

Patrick W. Kittredge, Esquire
Kittredge, Donley, Elson, Fullem &
 Embrick
421 Chestnut Street, 5th Floor
Philadelphia, PA 19106

 Attorneys for the Council for
Tobacco Research, U.S.A., Inc.

Wilbur L. Kipnes, Esquire
Schnader, Harrison, Segal & Lewis
1600 Market Street, suite 3600
Philadelphia, PA 19103

 Attorneys for Smokeless Tobacco
Council, Inc.

Richard L. Kremnick, Esquire
Blank, Rome, Comisky & McCauley
One Logan Square
Philadelphia, PA 19103

 Attorneys for Hill & Knowlton, Inc.

Daniel F. Kolb, Esquire
Anne B. Howe, Esquire
Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

 Attorneys for RJR Nabisco
Holdings

Edward C. Schmidt, Esquire
Jones, Day, Reavis & Pogue
500 Grant Street, 31st Floor
Pittsburgh, PA 15219

Morton F. Daller, Esquire
Daller, Greenberg & Dietrich
7111 Valley Green Road
Valley Green Corporate Center
Fort Washington, PA 19034

 Attorneys for R.J. Reynolds
Tobacco

J. Kurt Straub, Esquire
Jonathan W. Hugg, Esquire
One Penn Center, 19th Floor
Obermayer, Rebmann, Maxwell &
 Hippel
1617 John F. Kennedy Boulevard
One Penn Center, 19th Floor
Philadelphia, PA 19103

 Attorneys for Liggett Group, Inc.,
and Liggett & Myers Tobacco

OPINION OF THE COURT

ROTH, Circuit Judge:

Mentholated tobacco products apparently pose greater health risks than non-mentholated ones. Plaintif fs, a group of African-Americans, brought a civil rights action, contending that, with this knowledge, defendant tobacco companies have targeted the marketing of mentholated tobacco products at African-Americans.

Plaintiffs, who designate themselves the "Black Smokers," are the Rev. Jesse Brown, the Uptown Coalition for Tobacco Control and Healing, Aaron Eleazar , Pansy Smith, Ellen Irving, and the National Association of African Americans for Positive Imagery, Inc. They brought this civil rights action on behalf of a class of all living Black Americans who have, since 1954, purchased or consumed mentholated

tobacco products. They named as defendants the tobacco companies: Philip Morris, Inc., R.J. Reynolds T obacco Company, RJR Nabisco Holdings Corporation, Br own & Williamson Tobacco Corporation, B.A.T . Industries, the American Tobacco Company, Lorillard T obacco Company, Inc., Liggett & Myers Tobacco Company, Liggett Group Inc. and United States Tobacco Company; the non-pr ofit organizations supported by the tobacco-industry: the Tobacco Institute, Inc., the Council for T obacco Research -- U.S.A., Inc., and Smokeless Tobacco Council, Inc.; and the public relations firm Hill & Knowlton, Inc. Black Smokers contend that each of the defendants has unlawfully engaged in targeted marketing and sales of mentholated tobacco products to African-Americans on the basis of their race in violation of the civil rights statutes codified at 42 U.S.C. SS 1981, 1982, 1983 and 1985(3). Black Smokers also assert a cause of action against defendants under Bivens v. Six Unknown Federal Narcotics Agents , 403 U.S. 388, 91 S.Ct. 1999 (1971), and the Fifth Amendment to the United States Constitution, arguing that defendants should be considered federal actors by virtue of the federal regulatory scheme to which the tobacco industry is subject.

The District Court granted defendants' motion to dismiss for failure to state a claim. We will affirm that decision. We agree with the District Court that Black Smokers' allegations of racially targeted marketing of mentholated tobacco products cannot, in the absence of any disparity between the products sold to African-Americans and the products sold to others, constitute a deprivation of contract or property rights actionable under SS 1981 or 1982. We also concur with the District Court that ther e is no allegation that defendants are state actors to support the S 1983 claim and that defendants cannot be r egarded as federal actors as is required to maintain the claims under Bivens and the Fifth Amendment. Although we agree with the District Court that Black Smokers failed to state a claim under S 1985(3), we need not reach the further question whether SS 1981 and 1982 claims can, as a matter of law, support a claim under S 1985(3). As the District Court noted, even assuming arguendo that Black Smokers could properly premise a S 1985(3) cause of action on a

5

violation of SS1981 and 1982, they have failed to state a claim under SS 1981 and 1982.

I. FACTS

In their Second Amended Complaint, Black Smokers allege that the defendants have unlawfully tar geted African–Americans with billboard, magazine, and other types of advertising in order to promote the sale to and consumption by African–Americans of various mentholated tobacco products. It is not disputed that the tobacco industry has designed certain menthol cigarettes specifically to appeal to African–American consumers, including R.J. Reynolds' "Uptown," a high tar , high nicotine menthol cigarette.1 Black Smokers contend, and defendants do not dispute, that medical research has demonstrated that mentholated tobacco products pose gr eater health risks than non-mentholated ones, including an incr eased incidence of cancers of the lung and pharynx. It is not disputed that, although African–Americans account for only 10.3% of the U.S. population, they account for a significantly greater share of menthol cigarette smokers. Black Smokers cite reports fixing the per centage of African–American menthol smokers at, variously, 31%, 61.5% and 66%. Apparently relying upon the 31% figure, defendants claim that a significant majority (69%) of menthol cigarette smokers are not African–Americans and that Black Smokers admit that fact. In addition to the allegation of racially targeted marketing, Black Smokers also charge defendants with "intentional racial discrimination" and a "conspiracy of deception and misrepr esentation against the African American public."

Black Smokers also accuse defendants of "a massive conspiracy to mislead the Black American public r egarding the safety of menthol tobacco products." Black Smokers identify three courses of conduct underlying the purported conspiracy: "(1) acting in concert to repr esent falsely that their menthol tobacco products are safe for African Americans to use; (2) engaging in a concerted campaign to

_____

1. The Uptown brand was withdrawn from the market by R.J. Reynolds in 1990 as a result of negative national publicity.

6

saturate the African American community with danger ous, defective and hazardous tobacco products, which Tobacco Industry knew caused harm, in violation of the civil and constitutional rights of African Americans; and (3) misrepresenting, suppressing, distorting, and confusing the truth about the health dangers of mentholated tobacco products." Notwithstanding these allegations, Black Smokers apparently concede in their opening appellate brief that African-Americans demonstrated their pr eference for menthol cigarettes before defendants initiated targeted advertising. In their reply brief and at oral argument, however, Black Smokers denied making such a concession and asserted that defendants created the African-American preference for menthol cigarettes. Black Smokers did not allege in their opening appellate brief that defendants interfere with the right of African-Americans to purchase non-menthol cigarettes or that menthol cigar ettes are not marketed and sold to persons other than African-Americans. However, in their reply brief and at oral argument, Black Smokers made the surprising statement that they "do not concede that Black Americans ar e free to purchase non-menthol cigarettes."

Black Smokers do not contend that the menthol cigarettes marketed and sold to African-Americans are themselves different from those sold to whites or other persons. Additionally, Black Smokers do not aver that African-Americans receive information about menthol cigarettes that differs in any respect from the information provided to others. However, in their r eply brief and at oral argument, Black Smokers made another surprising claim -- that while defendants suggest to African-Americans in advertising that menthol cigarettes are healthier than non-menthol cigarettes, are of high quality, enhance the smoker's image, and are glamorous, pr estigious and socially acceptable, "none of these sales messages or terms are targeted to white consumers." Black Smokers agree, however, that defendants have employed tar geted marketing (e.g., advertising using African-American models and athletes) to sell non-menthol cigarettes such as Camel, Lucky Strike, Kent and Eve. In addition, no party to the instant litigation alleges that defendants pr ovide any consumers with warnings concerning the additional health

7

risks posed by menthol cigarettes in comparison to non-mentholated tobacco products.

Black Smokers filed this action in the United States District Court for the Eastern District of Pennsylvania on October 19, 1998. A month later, Black Smokers filed a First Amended Class Action Complaint correcting the caption. By leave of the court, Black Smokers filed a Second Amended Complaint on December 9, 1998, in or der to add claims purportedly arising under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. S 1985(3). On January 8, 1999, defendants filed a motion to dismiss the Second Amended Complaint. The District Court granted the motion to dismiss on September 23, 1999. Jesse Brown et al. v. Philip Morris, Inc., et al., No. Civ. A. 98-5518, 1999 WL 783712 (E.D. Pa. Sept. 22, 1999). Black Smokers filed a timely Notice of Appeal on October 19, 1999.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. SS 1331, 1343(a)(1), (3) and (4), and 1332. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291. We exercise plenary r eview over the District Court's dismissal of a complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Gallas v. Supreme Court of Pennsylvania, 211 F.3d 760, 768 (3d Cir. 2000). We must accept as true all of the factual allegations in the complaint as well as the reasonable inferences that can be drawn from them. Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993). We may dismiss the complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spaulding, 476 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

## III. DISCUSSION

### A. REGULATING TOBACCO PRODUCTS

A brief summary of the federal regulation of the tobacco industry is a necessary prerequisite to a discussion of

8

Black Smokers' civil rights claims. Manufactur ers of cigarettes are subject to the Federal Cigarette Labeling and Advertising Act of 1965 and its successor, the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. S 1331, et seq. (together, the Labeling Act). The Labeling Act provides a comprehensive program of federal r equirements addressing the labeling and advertising of cigarettes and preempts certain state law damages actions relating to smoking and health which challenge the adequacy of warnings on cigarette packages or the propriety of a manufacturer's advertising or promotion of cigarettes. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 511, 112 S.Ct. 2608 (1992). In Cipollone, the Supreme Court was called upon to determine the contours of the federal pr eemption of state law actions under the Labeling Act. The Court held that (i) the 1965 Act does not preempt state law damages actions in general; (ii) the 1969 Act does preempt claims based on a failure to warn and on the neutralization of federally mandated warnings to the extent that such claims rely on omissions or inclusions in a manufacturer's advertising or promotions; and (iii) the 1969 Act does not pr eempt claims based on express warranty, intentional fraud and misrepresentation, or conspiracy. See Cipollone v. Liggett, 505 U.S. at 530-31.

B. CIVIL RIGHTS CLAIMS: SECTIONS 1981 AND 1982

Section 1981, which prohibits racial discrimination in the making and enforcement of contracts and pr operty transactions, provides:

> All persons within the jurisdiction of the United States
> shall have the same right in every State and T erritory
> to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws
> and proceedings for the security of persons and
> property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes,
> licenses and exactions of every kind, and to no other.

42 U.S.C. S 1981(a). Section 1981 is derived from the Civil Rights Act of 1866 and from the reenactment of Section 1 of the 1866 Act in 1870. Mahone v. Waddle , 564 F.2d 1018,

9

1030 (3d Cir. 1977), citing Runyon v. McCrary, 427 U.S. 160, 168-70 & n.8; Civil Rights Act of 1866, ch. 31, section I, 14 Stat. 27, reenacted, Civil Rights Act of 1870, ch. 114 SS 16, 18, 16 Stat. 144, codified at  42 U.S.C. SS 1981, 1982. The legislative history of the 1866 Act makes clear Congress's intent to enact "sweeping legislation implementing the thirteenth amendment to abolish all the remaining badges and vestiges of the slavery system." Mahone v. Waddle, 564 F.2d at 1030. As a result, the current statute rests not only on the Fourteenth Amendment but also on the Thirteenth Amendment to the Constitution. Runyon v. McCrary, 427 U.S. at 190 (Stevens, J., concurring).

Section 1982, which prohibits racial discrimination in transactions relating to real and personal property, provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. S 1982. Like S 1981, S 1982 is a Reconstruction statute enacted to effectuate the aims of the Thirteenth and Fourteenth Amendments to the Constitution. Because of the historic interrelationship between the two statutes, courts have consistently construed them together . See Saunders v. General Services Corp., 659 F .Supp. 1042, 1063 (E.D. Va. 1987), citing Tillman v. Wheaton-Haven Recreation Association, 410 U.S. 431 (1973); McCrary v. Runyon, 427 U.S. 160 (1976).

Although not identical, the requisite elements of claims under SS 1981 and 1982 are quite similar . In neither case need a plaintiff allege state action on the part of the defendant. See Stirgus v. Benoit, 720 F.Supp. 119 (N.D. Ill. 1989) (S 1982). In order to state a claim under S 1981, a plaintiff "must allege facts in support of the following elements: (1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concer ning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts. . . ."

10

Yelverton v. Lehman, No. Civ. A. 94-6114, 1996 WL 296551, at *7 (E.D. Pa. June 3, 1996), aff 'd mem., 175 F.3d 1012 (3d Cir. 1999). In order to bring an action under S 1982, a plaintiff "must allege with specificity facts sufficient to show or raise a plausible inference of 1) the defendant's racial animus; (2) intentional discrimination; and 3) that the defendant deprived plaintiff of his rights because of race." Garg v. Albany Indus. Dev. Agency, 899 F . Supp. 961, 968 (N.D.N.Y. 1995), aff 'd, 104 F.3d 351 (Table), 1996 WL 547184 (2d Cir. Sept. 26, 1996). See also Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 616-17, 107 S.Ct. 2019 (1987).

Accepting as true the facts alleged in the complaint, we conclude that Black Smokers have not alleged a claim cognizable under either S 1981 or S 1982. Black Smokers do not make the sort of claim that is most readily actionable under the statute: that they have been deprived by defendants of the right to contract for, pur chase, own or use either menthol or non-menthol cigarettes. Black Smokers do not aver that defendants have engaged in a discriminatory refusal to deal with African-Americans with respect to either menthol or non-menthol cigar ettes. Nor do Black Smokers claim that defendants have dealt with customers on differing terms on the basis of race; Black Smokers concede that defendants sell menthol cigar ettes to African-Americans at the same price and on the same terms as such products are of fered to whites. Significantly, Black Smokers do not allege that the mentholated tobacco products sold to African-Americans differ from those sold to whites. Furthermore, at no place in their submissions do Black Smokers argue any disparities with r espect to the marketing or sales of non-menthol tobacco pr oducts on the basis of race. Consequently, it is difficult to understand Black Smokers' allegations to constitute a deprivation of contract or property rights actionable underSS 1981 or 1982. Indeed, Black Smokers' complaint appears instead to present quite the opposite situation. Defendants are alleged to encourage the consumption by African-Americans of certain of their products: mentholated cigar ettes, snuff, and chewing tobacco.

The question at the heart of Black Smokers' SS 1981 and 1982 claims, then, is whether such encouragement is

11

unlawful under the civil rights statutes. At the outset, we note that neither party has alerted us to the existence of any authority standing for the proposition that an encouragement to deal is actionable under such statutes. Some authority does exist in support of the notion that targeting consumers for sales of defective pr oducts on the basis of race is actionable under SS 1981 and 1982. For example, in Roper v. Edwards, 815 F .2d 1474 (11th Cir. 1987), a case cited by Black Smokers, the Court of Appeals for the Eleventh Circuit suggests that a cause of action under S1981 exists where a burial vault manufacturer made targeted sales of defective burial vaults to Black consumers. Although the case was brought by white plaintiffs who were inadvertently sold a defective vault, and although the Court of Appeals ultimately rejected plaintiffs' claims on other grounds, Black Smokers corr ectly argue that the Eleventh Circuit did not reject the cause of action. Nevertheless, Roper is readily distinguishable from the case at bar because unlike Roper, which involved deceptive sales to African-Americans of products that dif fered from those sold to whites, this case concerns identical products; defendants sell the same menthol cigarettes to everyone.

One might argue that if racially directed marketing of menthol cigarettes resulted in a situation in which virtually all mentholated tobacco products were consumed by African-Americans and substantially all non-mentholated tobacco products by others, that case might come within the sweep of Roper. However, Black Smokers have not alleged such a situation.

In order to salvage their S 1981 claims, Black Smokers resort to several alternative theories of recovery. First, they suggest that defendants' advertisements for menthol cigarettes constitute express warranties containing misrepresentations and false statements. This argument seems to constitute a claim of breach of expr ess warranty, intentional fraud or misrepresentation. Although it is true that the Labeling Act does not preempt such an action, Cipollone v. Liggett, 505 U.S. at 526-529, 530-31, Black Smokers fail to make sufficiently detailed allegations with respect to any of these potential causes of action. Black Smokers imply in their submissions, and asserted at oral

12

argument, that defendants fail to disclose the increased health risks of menthol cigarettes and that the African-American community suffers damages as a r esult of its higher consumption of mentholated tobacco pr oducts. Although that claim may be factually true, it is not actionable. The Supreme Court has held that the 1969 Act preempts claims based on a failure to war n and on the neutralization of federally mandated warnings to the extent that such claims rely on omissions or inclusions in advertising or promotions. Cipollone v. Liggett, 505 U.S. 504, 530–531.

Second, Black Smokers attempt to raise a claim of segregated market exploitation by arguing that defendants' practices fall within the ambit of segregated housing cases such as Clark v. Universal Builders, Inc., 501 F.2d 324 (7th Cir. 1973). This claim also fails on both factual and legal grounds. In the segregated housing cases, unlike the instant case, the defendants sold houses to Black purchasers on substantially differ ent and more onerous terms than to others, effectively cr eating two separate, racially-segregated markets. See, e.g., Clark v. Universal Builders, 501 F.2d at 328. Black Smokers, however, point to no such disparities in the sale of mentholated tobacco products, apart from the generalized allegation that African-Americans are more likely than others to buy mentholated tobacco products as a result of tar geted advertising.

Moreover, even if Black Smokers' segr egated market exploitation claims were cognizable on the facts alleged, we must reject them on procedural grounds. It does not appear that Black Smokers advanced such claims in the District Court; arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible of review in this Court absent exceptional cir cumstances (e.g., the public interest requir es that the issues be heard or manifest injustice would result from the failure to consider such issues). See, e.g., United States v. Anthony Dell'acquilla Enter. & Subsidiaries, 150 F.3d 329, 335 (3d Cir. 1998) (citations omitted); United Parcel Serv. Inc. v. International Brotherhood of T eamsters, 55 F.3d 138, 140 n.5 (3d Cir. 1995). No such exceptional cir cumstances are apparent here.

13

Third, Black Smokers assert that defendants' targeted marketing practices violate the "full and equal benefit" clause of S1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . .." 42 U.S.C. S 1981(a). Again, we must reject Black Smokers' "full and equal benefit" claims because they do not appear to have been raised in the District Court and no exceptional circumstances suggest review of such claims notwithstanding Black Smokers' failure to ar gue them previously. United States v. Anthony Dell'acquilla Enter. & Subsidiaries, 150 F.3d at 335 (citations omitted). Moreover, even if we were to consider them, such "full and equal benefit" claims would fail in light of a substantial line of authority holding that only state actors can be sued under the "full and equal benefit" clause of S1981. Mahone v. Waddle, 563 F.2d 1018, 1029 (3d Cir. 1977); Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F.Supp.2d 27, 30 n.1 (D.D.C. 1999) (dictum); Lewis v. J.C. Penney Co., 948 F.Supp. 367, 371 (D.Del. 1996) (citations omitted); Sterling v. Kazmierczak, 983 F.Supp. 1186, 1192 (N.D. Ill. 1997). As we explain in Sections III C and D, infra, the defendants in the instant case cannot be regarded as federal or state actors.

Notwithstanding Black Smokers' arguments to the contrary, their complaints essentially constitute discriminatory advertising claims. Black Smokers virtually admit as much when they characterize their claims as allegations of discriminatory targeting in sales of allegedly defective products. Although Black Smokers ar gue that their claims resemble racial profiling and racially-motivated prepayment cases, all such fact patterns are distinguishable from the instant case because they involve either a naked, racially-motivated restriction on dealing or a race-based variation of the terms of the contract at issue. Consequently, Black Smokers' claims remain fundamentally allegations of discriminatory advertising and are not therefore cognizable underSS 1981 or 1982.

Even in the context of housing discrimination -- arguably a paradigmatic example of the rights Congress sought to

14

protect under the Civil Rights Acts -- ample authority exists in support of the proposition that discriminatory advertising is not actionable under SS 1981 and 1982. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413, 88 S.Ct. 2186 (1968) (noting that S1982 does not pr ohibit "advertising or other representations that indicate discriminatory preferences"); Span v. Colonial Village, Inc., 899 F.2d 24, 35 (D.C. Cir. 1990) (holding that SS 1981 and 1982 do not prohibit real estate advertisements indicating discriminatory preferences); Saunders v. General Services Corp., 659 F.Supp. 1042 (E.D. Va. 1987) (declining to apply SS 1981 or 1982 to racially discriminatory advertising for rental housing); Ragin v. Steiner, Clateman and Assocs., 714 F.Supp. 709, 713 (S.D.N.Y. 1989) (same in context of cooperative apartment complex).

C. SECTION 1983

42 U.S.C. S 1983 provides a cause of action against any "person who, under color of any statute, or dinance, regulation, custom, or usage, of any State or T erritory or the District of Columbia, subjects, or causes to be subjected" any person to the deprivation of any right protected by federal law or the United States Constitution. Unlike SS 1981 and 1982, S 1983 is derived from the Civil Rights Act of 1871, which was enacted to enfor ce the Fourteenth Amendment. Mahone v. Waddle , 564 F.2d 1018, 1031 (3d Cir. 1977). Moreover, the Act of 1871, unlike the Act of 1866, is addressed only to the state and to those acting under color of state authority. Id. (citations omitted). It is well established that liability under S 1983 will not attach for actions taken under color of federal law. Bethea v. Reid, 445 F.2d 1163, 1164 (3d Cir . 1971). In light of the fact that Black Smokers have not alleged that defendants are state, rather than federal actors, the District Court properly granted defendants' motion to dismiss as to Black Smokers' S 1983 claims.

D. THE BIVENS AND FIFTH AMENDMENT CLAIMS

The controlling question with respect to Black Smokers' claims under Bivens, supra, and the federal Constitution is

15

whether defendant tobacco companies should be r egarded as federal actors. In Bivens, the Supr eme Court found that a damages claim arose under the federal Constitution where a federal agent acting under color of federal authority violated the Fourth Amendment. Id. A Bivens action, which is the federal equivalent of the S 1983 cause of action against state actors, will lie where the defendant has violated the plaintiff 's rights under color of federal law. Alexander v. Pennsylvania Dep't of Banking, No. Civ. 93–5510, 1994 WL 144305, at *3 (E.D. Pa. April 21, 1994). Black Smokers also make "direct constitutional" claims under the Fourteenth and Fifth Amendments. As the District Court noted in its opinion, the Fourteenth Amendment only applies to actions of the states and not to the federal government; therefore, the District Court properly granted defendants' motion to dismiss the Fourteenth Amendment claims. For Black Smokers' Bivens and Fifth Amendment claims to succeed, Black Smokers must establish that defendants are federal actors. Because defendants' conduct cannot properly be r egarded as federal, these claims must fail.

In order to determine whether the conduct of a private party should be attributed to the federal gover nment, courts apply the "state action" analysis set forth by the Supreme Court in Lugar v. Edmonson Oil Co. , 457 U.S. 922, 937–42, 102 S.Ct. 2744 (1982). The Supreme Court succinctly summarized the two-part test of Lugar in its decision in Edmonson v. Leesville Concrete, 500 U.S. 614, 620, 111 S.Ct. 2077 (1991). There, the Court stated that Lugar requires courts to ask "first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in [federal] authority . . . and second, whether the private party charged with the deprivation could be described in all fairness as a [federal] actor." Leesville Concrete, 500 U.S. at 620 (applying Lugar) (citations omitted). Citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 119 S.Ct. 977 (1999), Black Smokers argue that their claims satisfy the first pr ong of Lugar insofar as defendants had acted "with knowledge of and pursuant to" the statute in question: the Labeling Act. This argument is unavailing because it fails to allege a deprivation of a right protected by the Constitution.

16

Moreover, the averment that defendants should be subject to the mandates of the Constitution because their activities have been allegedly approved by the federal government through defendants' compliance with the Labeling Act is unconvincing. The mere fact that a tobacco company has complied with the requirements of a federal law cannot suffice to transform it into a federal actor any more than the compliance of a myriad of private enterprises with federal law and administrative regulations could of itself work such a transformation.2  Additionally, because the alleged wrongdoing (the targeted advertising of mentholated tobacco products to African-Americans) is not required by the Labeling Act, it is difficult to view such targeted advertising as federal action by defendants which can serve as the basis for a Bivens action.

The second requirement of the Lugar  analysis -- that the private party could in all fairness be r egarded as a federal actor -- may be met under one of three interr elated theories of government action: (i) the "public function" test, (ii) the "close nexus" test and (iii) the "symbiotic relationship" test. In addition, Black Smokers discern in case law a fourth, more synthetic "totality of the circumstances" test, the existence of which is doubtful, as we explain infra. In order to determine which test should be applied to a given set of facts, courts must investigate carefully the circumstances of each case. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856 (1961); Community Med. Center v. Emergency Med. Services, 712 F .2d 878, 880 (3d. Cir. 1983) (citations omitted). Regar dless of what test is ultimately applied, the object of the inquiry is to determine whether a private entity has exercised powers traditionally reserved exclusively to the government, Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352, 95 S.Ct. 449 (1974), or whether "the defendant exercised power possessed by virtue of [federal] law and made possible only because the wrongdoer is clothed in the authority of [federal] law." Groman v. T ownship of Manalapan, 47 F.3d 628, 639 n.17 (3d. Cir. 1995) (citations omitted).

The gravamen of the "public function" test is whether the

_____

2. See our discussion of the "public function" test in this Section, infra.

17

government is effectively using the private entity in question to avoid a constitutional obligation or to engage in activities reserved to the government. See Goussis v. Kimball, 813 F.Supp. 352, 357 (E.D. Pa. 1993). We cannot agree with Black Smokers' assertion that defendants' actions satisfy the "public function" test. The "public function" test is the most rigorous of the inquiries. In Blum v. Yaretsky, 457 U.S. at 1004-5, the Supreme Court stressed that the traditionally public function must be the "exclusive prerogative of the [gover nment]," id. (citation omitted). Courts generally emphasize this "exclusivity" requirement and thus seldom find that high standard to have been satisfied. Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d. Cir. 1995). Even in cases involving arguably semi-public functions, such as pr oviding utility services, see Jackson v. Metropolitan Edison Co., supra, or furnishing remedial education to high school students, see Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764 (1982), the Supreme Court has declined to characterize such activities as government functions for purposes of the public function analysis.

In the case at bar, the action complained of is the lawful sale and marketing of a legal, albeit federally r egulated, consumer product: a private rather than public, and a fortiori not "exclusively" public, function. Even if the activities at issue extended, as Black Smokers suggest, beyond the mere marketing and sale of mentholated tobacco products to the testing and labeling of such products, Black Smokers' argument would fail because it would not meet the exclusivity requirement under the public function test. Given that many products, including mentholated tobacco, are tested, marketed and labeled by their manufacturers, often in accordance with applicable regulatory requirements, such activities cannot be characterized as the exclusive prerogative of the government. As the District Court noted, it is simply inaccurate to suggest that the testing, labeling and marketing of cigarettes is the exclusive pr ovince of the federal government. Finally, Black Smokers' averment that defendants' compliance with various federal labeling requirements transforms defendants into government actors is without support in applicable case law. Such

18

propositions have been flatly rejected by the Supreme Court on several occasions; see American Mfrs. Mut. Ins. v. Sullivan, 526 U.S. 40 (1999); Blum v. Y aretsky, 457 U.S. at 1004; Jackson v. Metropolitan Edison Co ., 419 U.S. 345, 350 (1974) (holding that the fact that a business is subject to government regulation does not by itself convert the business's action into that of the government).

Black Smokers' allegations that defendants' actions satisfy the "close nexus" test under the gover nment action analysis are also unavailing. As with the public function analysis, Black Smokers apparently discer n the purported nexus between the private action complained of and the federal government in the operation of the Labeling Act. They assert that the Labeling Act encourages tobacco manufacturers to conceal the dangers of mentholated cigarettes, mandates inadequate warnings on such products and preempts most tort actions against defendants. However, because the Labeling Act does not compel, influence or encourage the actions upon which this suit is based -- the targeted marketing of menthol cigarettes to African-Americans -- but rather only requires the disclosure of certain risks on tobacco pr oduct packaging, defendants' conduct in compliance with the Labeling Act does not create the "close nexus" necessary for a finding of state action. See Rendell-Baker v. Kohn, 457 U.S. 830 (1982); American Mfrs. Mut. Inc. Co. v. Sullivan, 526 U.S. at 52; Goussis v. Kimball, 813 F .Supp. at 357. Additionally, Black Smokers' "close nexus" ar gument is defective to the extent that it does not allege the violation of a federal right, a prerequisite under that analysis. See Goussis v. Kimball, 813 F.Supp. at 357.

Black Smokers' attempt to classify this case under the "symbiotic relationship" category of state action cases is similarly tenuous. In the seminal, albeit somewhat idiosyncratic, case of Burton v. Wilmington Parking Auth., supra, the Supreme Court held that a cof fee shop, which leased property located in a government owned parking garage, was integrated with the parking facility as an organic part of the government operation and was party to a mutually beneficial relationship with the government. Out of these facts arose the "symbiotic r elationship test," which

asks whether the government has "insinuated itself into a position of interdependence" with the defendant. Burton v. Wilmington Parking Auth., 365 U.S. at 725.

Black Smokers' allegations concerning defendants' relationship with the federal government prove both too little and too much; and in any case, they scar cely suffice to make out a "symbiotic relationship" within the meaning of Burton. Black Smokers aver that (i) the government benefits from its relationship with defendants by virtue of collecting "enormous tax revenues" from the tobacco industry and (ii) the interests of the gover nment and defendants are "explicitly intertwined" under the terms of the Labeling Act, id. While these aver ments are undoubtedly true, they are inadequate to demonstrate government action. Virtually all enterprises are subject to tax collection and, to varying degrees, to r egimes of administrative regulation; were these attributes sufficient to satisfy the test of Burton, substantially all businesses in the country would effectively become federal actors. See Hadges v. Yonkers Racing Corp., 918 F .2d 1079, 1082 (2d Cir. 1990). Moreover, although Burton retains much of its precedential value, it should be noted that the Supreme Court has recently cast some degree of doubt upon that decision. In American Mfrs. Mut. Ins. Co. v. Sullivan, supra, which reversed our finding that certain private insurance companies were to be regarded as state actors under Burton, the Supreme Court noted that " Burton was one of our early cases dealing with `state action' under the Fourteenth Amendment, and later cases have r efined the vague `joint participation' test embodied in that case." Id., 526 U.S. at 57 (citations omitted).3

_____

3. We recently applied the doctrine of Burton, as refined by the Supreme Court in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965 (1972), in Crissman v. Dover Downs Entertainment Inc., No. 00-5178, ___ F.3d ___ (2001). The instant case is distinguishable from Crissman because in the latter case, which involved state-licensed harness racing and related gambling activities, state involvement extended far beyond regulation and revenue collection. In Crissman, the harness racing operator functioned as the state's agent with r espect to video lottery operations and was obligated to enforce a state statute relating to harness racing. See Crissman, ___ F.3d at ___ – ___ [Section III]. Such an agency relationship coupled with law enfor cement authority confers upon the operator attributes of government sovereignty wholly absent in the federal government's regulation of tobacco manufacturers.

20

Finally, Black Smokers contend that an expansive, fact-oriented "totality of the circumstances" approach to the question of government action exists wholly apart from the three inquiries discussed supra and that such an approach is grounded in Third Circuit cases such as Sullivan v. Barnett, 139 F.3d 158 (3d Cir . 1998), rev'd 526 U.S. 40 (1999), and Mark v. Borough of Hatbor o, 151 F.3d 1137 (3d. Cir. 1995). Although our cases place "the factual context in which the case arises," Sullivan v. Bar nett, 139 F.3d at 170, at the heart of the government action analysis, such emphasis constitutes no more than proper adherence to the methodology set forth in the government action cases discussed supra and consequently cannot be said to represent a novel development in or distinct branch of government action doctrine.

Purporting to use this asserted "totality of the circumstances" test as the basis of their r emaining government action analysis, Black Smokers compare the instant case to Edmonson v. Leesville Concr ete, 500 U.S. 614 (1991). Leaving aside the question whether the federal courts have ever explicitly recognized Black Smokers' "totality of the circumstances" appr oach, the facts of the instant case are readily distinguishable from those of Edmonson. In Edmonson, the Supreme Court held that lawyers' use of peremptory challenges was pursuant to a course of government action and consequently that any racially discriminatory use of such challenges violates jurors' equal protection rights. Edmonson v. Leesville Concrete, 500 U.S. at 622-23. The sine qua non of the Court's decision in Edmonson was the pr esence of government involvement so pervasive in the context of the challenged actions as to render such actions virtually inseparable from the participation of the gover nment. The Edmonson Court therefore emphasized that peremptory challenges "simply could not exist" without the government's "significant participation." Id. at 622. The Court went on to characterize the jury as "a quintessential government body, having no attributes of a private actor," id. at 624, and to note that peremptory challenges are performed in the context of an inar guably "traditional government function": trial by jury. Id . By contrast, in the instant case, the federal government does not in any

21

manner design, mandate or approve the alleged racially targeted advertising of which Black Smokers complain, notwithstanding the fact that such advertising is subject to certain requirements and restrictions set forth in the Labeling Act. Black Smokers' insistence at oral argument that the preemption of certain categories of tort actions by the Labeling Act in some way constitutes the exercise of a traditional government function or significant governmental participation within the meaning of Edmonson is also without support in applicable precedent; indeed, such preemption provisions are commonplace in federal product safety and information disclosure legislation. See, e.g., Federal Hazardous Substances Act, 15 U.S.C. 1261 et seq., note (b)(1)(A); Moss v. Parks Corp., 985 F .2d 736, 739-41 (4th Cir. 1993) (construing preemption provision of Federal Hazardous Substances Act). Moreover , the marketing and advertising practices of defendants, including their research and safety testing activities, are functions typical of various private enterprises and, even in light of the federal regulation to which such activities are subject under the Labeling Act and other legislation, are difficult to regard as "traditional government function[s]" within the meaning of Edmonson.

E. SECTION 1985(3) CLAIM

Black Smokers' 42 U.S.C. S 1985(3) claims are deficient in several respects and consequently may be disposed of relatively quickly. Section 1985(3) provides, in pertinent part:

> If two or more persons in any State or T erritory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . .[and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party

22

> so injured or deprived may have an action for r ecovery
> of the damages, occasioned by such injury or
> deprivation, against any one or more of the
> conspirators.

42 U.S.C. S 1985(3). In general, the conspiracy provision of
S 1985(3) provides a cause of action under rather limited
circumstances against both private and state actors. In
order successfully to bring an action underS 1985(3) for
private conspiracy, a plaintiff must show, inter alia, "(a)
that a racial or other class-based invidious discriminatory
animus lay behind the coconspirators' actions, (b) that the
coconspirators intended to deprive the victim of a right
guaranteed by the Constitution against private impairment,
and (c) that that right was consciously targeted and not
just incidentally affected." Spencer v. Casavila, 44 F.3d 74,
77 (2d Cir. 1994) (citation omitted); see also Tilton v.
Richardson, 6 F.3d 683, 686 (10th Cir. 1993) (holding that
the same elements are required forS1985(3) claims against
private actors). In order to prevent the use of S1985(3) as a
general federal tort law, courts have been car eful to limit
causes of action thereunder to conspiracies that deprive
persons of constitutionally protected rights, privileges and
immunities "that are protected against private, as well as
official encroachment." Libertad v. W elch, 53 F.3d 428, 446-
50 (1st Cir. 1995).

It is well established that S 1985(3) does not itself create
any substantive rights; rather, it serves only as a vehicle for
vindicating federal rights and privileges which have been
defined elsewhere. See Great Am. Fed. Sav. & Loan Ass'n v.
Novotny, 442 U.S. 366, 376, 99 S.Ct. 2345 (1979).
Moreover, in the context of actions br ought against private
conspirators, the Supreme Court has thus far r ecognized
only two rights protected under S 1985(3): the right to be
free from involuntary servitude and the right to interstate
travel. See Bray v. Alexandria Women's Health Clinic, 506
U.S. 263, 278, 113 S.Ct. 753 (1993); Caswell v. The
Morning Call, Inc., No. Civ. A. 95-7081, 1996 WL 560355,
at *6 (E.D. Pa. Sept. 30, 1996); Welch v. Board of Dirs. of
Wildwood Golf Club, 877 F.Supp. 955, 959 (W.D. Pa. 1995).

The instant case is distinguishable from the cases cited
above because Black Smokers assert the deprivation of a

23

different type of rights: those of pr operty and contract. Additionally, the District Court correctly observed that because such rights -- which entail freedom from discrimination by a private actor -- are statutorily enacted, rather than of purely constitutional pr ovenance, they cannot be vindicated under S 1985(3).

Black Smokers attempt to salvage their S 1985(3) claims by arguing that defendants' alleged violations of SS 1981 and 1982 may support a claim under S 1985(3). In light of the overwhelming preponderance of authority on the question, this argument, too, must fail. Contrary to Black Smokers' claims, Bray does not support the proposition that SS 1981 or 1982 claims can form the basis of a S 1985(3) claim or the notion that the contract and property rights protected by SS 1981 and 1982 fall within the category of "involuntary servitude" violations that may support a S 1985(3) claim. Isolated authority from the District Court for the District of Columbia does exist in support of the theory that a S 1985(3) claim may be based on a S 1981 claim. See Johnson v. Gr eater Southeast Community Hospital Corp., 903 F.Supp. 140, 153-154, citing Alder v. Columbia Historical Society, 690 F .Supp. 9 (D.D.C. 1988); Thompson v. Int'l Assoc. of Machinists , 580 F.Supp. 662 (D.D.C. 1984). The great weight of pr ecedential authority, however, supports the traditional limitation of S 1985(3) to questions of interstate travel and involuntary servitude and does not suggest that SS 1981 or 1982 claims in general may form the basis of a S 1985(3) action. See, e.g., Sanders v. Prentice-Hall Corp. , 178 F.3d. 1296 (Table), 1999 WL 115517, at *2 (6th Cir. Feb. 8, 1999); Libertad v. Welch, 53 F.3d 428, 447 n.15 (1st Cir. 1995); Tilton v. Richardson, 6 F.3d 683, 686 (10th Cir. 1993). We need not, however, resolve the question whether violations of SS 1981 and 1982 can support a S 1985(3) claim because Black Smokers have failed to state a claim under eitherS 1981 or S 1982.4 The District Court therefore correctly dismissed Black Smokers' claims under S1985(3).

_____

4. See Section III B, supra.

24

IV. CONCLUSION

For the foregoing reasons, we will affir m the decision of the District Court in all respects. The District Court correctly held that Black Smokers' claims of racially targeted advertising and marketing of mentholated tobacco products were inadequate to state a cause of action under 42 U.S.C. SS 1981 and 1982. Because Black Smokers do not demonstrate that defendants should be regar ded as state actors, the District Court properly dismissed their claims under 42 U.S.C. S 1983 as well. Finally, we will affirm the District Court's conclusion that Black Smokers fail to allege adequately that defendants ar e federal actors for purposes of claims asserted either pursuant to Bivens or directly under the federal Constitution and that they fail to state a cause of action under S 1985(3).

25

SHADUR, District Judge, Dissenting in part:

What has been said in the majority opinion may pr operly be viewed as having put forth the best possible case for affirmance of the District Court's dismissal of the Black Smokers' Second Amended Complaint ("Complaint"). But that presentation, I believe, has despite itself highlighted the basic flaws in such a threshold Fed. R. Civ. P. ("Rule") 12(b)(6) dismissal. Accordingly I dissent fr om the portion of the majority opinion that rejects Black Smokers' claims under Sections 1981, 1982 and 1985(3) at the thr eshold of the case.1

Both the panel majority and I necessarily pr oceed from the seminal statement in Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) of the quite undemanding bur den that Rule 12(b)(6) imposes on a plaintiff 's complaint:

> A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Conley v. Gibson, 355 U.S. 41, 45–46 (1957).

And the majority opinion also correctly r ecognizes, though I fear it does not fairly apply, the proposition that all reasonable inferences that can be drawn fr om the allegations in the Complaint, as well as the allegations themselves, must be accepted as true (Moor e v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993)).

Because we deal with a Complaint whose allegations must thus be credited, there is no need to dwell at length on the appalling record disclosed by Black Smokers' pleading. Their 110-page 211-paragraph Complaint does not comport with the Rule 8(a)(2) requir ement of "a short and plain statement of the claim showing that the pleader

_____

1. Because I agree that there is no pr edicate for ascribing state actor or federal actor status to the tobacco companies or the other defendants, I concur in the majority's rejection of Black Smokers' claims under Section 1983 and under the Bivens line of authority. And while speaking of the other defendants, to simplify the ensuing discussion I will refer solely to the defendant tobacco companies, for in my view any sorting out among the defendants ought to be done by the district court on remand in light of what is said here.

26

is entitled to relief," but they can scar cely be faulted for what would normally be viewed as overkill in light of the undue judicial skepticism with which their ef fort has been met. It is sufficient for present purposes to refer to the substantially higher carcinogenic effects of the tobacco companies' mentholated products, the use of which an extensively quoted 1998 Surgeon General's r eport and other medical research discloses as having led to a much higher rate of lung cancer, pharyngeal cancer and other malignancies among Blacks (Complaint PP80-91), phenomena that had been confirmed by the tobacco companies' own significant research (which the companies had suppressed). And the Complaint further alleges that despite that knowledge, the companies nevertheless engaged in extensive conduct that adversely impacted on Black Smokers (id. PP48, 63), even including the actual design and introduction (though it was then abandoned in the face of public outrage) of a mentholated pr oduct expressly for Blacks (id. P45.c).

In that light, where I first part company with the majority opinion is in its having ruled as a matter of law "that Black Smokers' allegations of racially targeted marketing of mentholated tobacco products cannot, in the absence of any disparity between the products sold to African-Americans and the products sold to others, constitute a deprivation of contract or property rights actionable under SS1981 or 1982." And my departure fr om that unsupportable proposition flows directly from the straw man first erected by the majority opinion when it says:

> Black Smokers do not make the sort of claim that is most readily actionable under the statute: that they have been deprived by defendants of the right to contract for, purchase, own or use either menthol or non-menthol cigarettes.

What must be understood instead is that both Section 1981 and Section 1982 are not at all limited by their terms to the outright deprivation of the Black community's right to contract. Instead each of those statutes mandates an equal playing field that is violated by conduct that imposes different and race-discriminatory conditions (however created) on the exercise of seemingly comparable

27

contractual rights: Section 1981 guarantees to Black Smokers "the same right . . . to make . .. contracts . . . as is enjoyed by white citizens," while Section 1982 assures to Black Smokers "the same right . . . as is enjoyed by white citizens . . . to . . . purchase . . . personal property." And that is the gravamen of the Complaint--that by the tobacco companies' deliberate and successful targeting of Black Smokers to persuade them to purchase and smoke the concededly more dangerous menthol cigar ettes and smokeless tobacco--conduct whose actionability is akin to the prohibition of actual "steering" under the Fair Housing Act--those companies have impaired that equality of rights.

Nor should it avail the tobacco companies to attempt to trot out "freedom of contract" principles. On the uncontested allegations of the Complaint, they have deliberately suppressed the added perils cr eated by the mentholated products, concealing them fr om Black Smokers. And it just will not do for the tobacco companies to argue that they are somehow equal opportunity deceivers --that they have betrayed Whites and Blacks alike by their deception. When their alleged concealment of the known risks (known to them, that is) is coupled with their express efforts to maximize the sales of mentholated coffin nails and mentholated smokeless tobacco to Blacks, the inequality of treatment forbidden by Sections 1981 and 1982 is demonstrated by the fairly-read Complaint.

And this is not at all speculative. Defendants' r epeated (and it must be said hypocritical) emphasis on the fact that 69% of the mentholated products are used by non-Blacks is as deceptive as their historical conduct of denying the extraordinarily harmful effects of nicotine generally and of menthol in particular. What that repeated emphasis glosses over is the enormous disparity between the 10+% of the population represented by Blacks and the Black Smokers' 31%2 consumption of the menthol cigarettes. It will be recalled that the rule of thumb for demonstrating discrimination has been recognized in these ter ms for a

_____

2. As the majority opinion indicates, 31% is the most charitable (to the tobacco companies) of the numbers reflected by statistics cited in the Complaint. Other studies put that number as high as 61.5% and 66%.

28

quarter century (Castaneda v. Partida, 430 U.S. 483, 496–97 n.17 (1976)):

> As a general rule for such large samples, if the difference between the expected value and the observed number is more than 2 or 3 standard deviations, then the hypothesis that the difference was random will be suspect to a social scientist.

Two standard deviations equate to a 5% likelihood of chance distribution. And by contrast the probability that a 10% versus 31% disparity is a matter of mere chance represents, as an approximation (and essentially a conservative one) of the normal distribution, some 7 standard deviations––producing a figur e so small as to beggar the imagination: 1.28 in a trillion. 3

That extraordinary imbalance (truly an understatement, for such a huge disparity is almost beyond human comprehension) really cuts the legs out fr om under the majority opinion's attempt to distinguish the decision in Roper v. Edwards, 815 F.2d 1474 (11th Cir. 1987) by stating:

> One might argue that if racially directed marketing of menthol cigarettes resulted in a situation in which virtually all mentholated tobacco products wer e consumed by African-Americans and substantially all non-mentholated tobacco products by others, that case might come within the sweep of Roper. However, Black Smokers have not alleged such a situation.

In real world terms there is no conceptual difference between the notion that "virtually all mentholated tobacco products were consumed by African-Americans" and the situation in which that group's comparative consumption is so close to 100% of total consumption in the meaningful statistical sense.

It is surely unreasonable to ascribe such an enormous disparity to chance rather than to the purposeful steering that has been alleged by Black Smokers––at a minimum,

_____

3. That figure is derived from William Knight, Tables of the Normal Distribution, at http://www.math.unb.ca/~knight/utility/NormTble.htm.

they should be allowed their day in court to pr ove that racial animus may reasonably be inferred from the tobacco companies' deliberate targeting of African-Americans as their far-preferred targets of the more dangerous products at issue. There is no question that even the far, far smaller but still statistically significant disparity of two standard deviations suffices to warrant an inference of intentional discrimination--see, e.g., such cases as Smith v. Xerox Corp., 196 F.3d 358, 365-66 (2d Cir . 1999).

Nor I suggest will it do (as the tobacco companies have urged and as the majority opinion has cr edited) to say that Black Smokers cannot complain about that deliberate steering because Blacks were already pr edisposed to prefer the mentholated products. We are after all dealing with the case at its very outset. Nothing has been shown--because no opportunity has been given to Black Smokers--as to whether that preference was itself the pr oduct of the same kind of improper steering at the outset, or even if not, as to whether the earlier preference even began to approach (let alone to account for) the enormous disparity that now exists (a showing that might for example be accomplished, again to deal with statistical probabilities, through the application of multiple regression analysis).

In response to Black Smokers' uncontroverted allegations about the tobacco companies' purposeful steering of their known extra-harmful mentholated products to the African-American market, the majority opinion accepts the argument that this was no more than conventional advertising, something that Jones v. Alfr ed H. Mayer Co., 392 U.S. 409, 413 (1968) characterized as nonactionable under Section 1982. But Jones v. Mayer, id. said only this in the course of announcing for the first time that Section 1982 applies to private as well as public racial discrimination in the sale of property (a statement made in the course of contrasting that statute with the full-bore open housing law that was then brand new on the books):

> It [Section 1982] does not prohibit advertising or other representations that indicate discriminatory preferences.

That sanitization of mere statements of discriminatory preferences does not control her e, however, for when such

30

discriminatory preferences are translated into discriminatory action, as is alleged her e (and as we must credit), the actor cannot fairly be insulated from the impact of Section 1982 (or of Section 1981) by asserting that its advertising was a means by which it accomplished that forbidden end.

Indeed, that is precisely the thrust of the eloquent opinion by the late Judge Luther Swygert in Clark v. Universal Builders, 501 F.2d 324 (7th Cir . 1974), which found support rather than a lack of support in Jones v. Mayer, but which the majority opinion seeks to distinguish because the sales of housing to Black purchasers in Clark were on more onerous terms than the sales to non-Blacks. But once again I suggest that the attempted distinction is hollow--that defendants' conduct set out in the Complaint in this case effectively created the same type of separate, racially-segregated market as was found actionable in Clark. Such cases as Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1525, 1529 (7th Cir. 1990) teach that racial steering is forbidden both by Section 1982 and by the Fair Housing Act (each of which was implicated ther e)--and of course Section 1982 is not limited to anti-Black discrimination in housing, as is the Fair Housing Act.4

_____

4. Even brief reflection on what Jones v. Mayer did not say, as well as on what it did say, demonstrates that the majority opinion loads that opinion's single sentence quoted above with mor e baggage than it can reasonably carry. Just as there is nothing actionable (for example) in the seller of clothing deciding that it wishes to expand its market by depicting Black as well as White models in its clothing ads, so too a mere indication of racial preferences in advertising is not actionable as such under Section 1982. But what I believe is just as obviously prohibited by that statute is using such advertising to deny Blacks the same treatment as Whites--the rights to contract and to purchase under the same conditions--by deliberately subjecting Blacks to the far greater impact of the seriously (often fatally) deleterious effects of the advertised
product--effects well known to but undisclosed by the tobacco companies. And as for the majority opinion's ef fort to distinguish Clark v. Universal Builders, it is necessarily appar ent (though it was undiscussed because not placed into issue ther e) that the Black purchasers in that case were the victims of sales of substandard housing --in violation of Section 1982--that had to be accomplished through advertising. After all, the alternative pr emise of assuming that those

Finally, what of the required showing of racial animus? Is it a defense for the tobacco companies to urge that their pattern of general concealment and deception reflected nothing more than a free market desire to make profit, and that their targeting of Black Smokers was nothing more than a desire to maximize those profits because the Blacks were most vulnerable to the most deleterious products? Again, unlawfully discriminatory intent under the discrimination laws generally has been recognized as reasonably inferable from far less evidence of disparate impact--should any different principle apply here? Once more the tobacco companies' callous indifference to smokers' health has been demonstrably more marked toward Black Smokers--that is the combined effect (1) of the tobacco companies' knowledge (and their concealment of that knowledge) about the special deadliness of the mentholated products that they have been marketing and (2) of their express targeting of those products toward the African-American community.

It is not of course my purpose to express any conclusion as to the existence or nonexistence of the prohibited intent. Instead the focus of this opinion is to stress the requirement that, as with all other factual issues, intent must be resolved by a factfinding jury (or perhaps by a judge in the summary judgment context of Rule 56, rather than at the preliminary pleading stage under Rule 12(b)(6), where plaintiffs' allegations must be accepted as true). And to that end I find it particularly poignant that we deal here with a group of defendants whose industry is centered in an area where Blacks were once chattels, viewed as subhuman--again ironically in terms of the present litigation, chattels whose slave labor was responsible in large part for the economic success of the tobacco industry. Even though a century and a half has elapsed since that

_____

sales were spontaneously generated would require turning the aphorism credited to Emerson on its head to read:

> If a man can make a worse mouse-trap than his neighbor, though he builds his house in the woods the world will make a beaten path to his door.

32

mindset was supposed to have been eliminated by the Civil War and by the post-War Civil Rights Acts (including Sections 1981 and 1982), all of us know that the r eality of racial prejudice has unfortunately long outlived the theory embodied in those statutes. Whether any such pr ejudice has been at work here should not, I believe, be resolved on a threshold determination of the likelihood or unlikelihood of Black Smokers' ability to prove their allegations in that respect.

We would do well to remember what Justice O'Connor (speaking for a unanimous Supreme Court on this issue) said in rejecting the threshold dismissal of a pro se prisoner's complaint because of a judicial view that its allegations were unlikely (Denton v. Her nandez, 504 U.S. 25, 33 (1992)):

> Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age-old insight that many allegations might be "strange, but true; for truth is always strange, Stranger than fiction." Lord Byron, Don Juan, canto XIV, stanza 101 (T. Steffan, E. Steffan, & W. Pratt eds. 1977).

Black Smokers are surely entitled to no less, where their factual assertions are so solidly supported (and not in the least fanciful), and where the perceived problems with their Complaint really represent skepticism as to their ability to prove causation and intent--classic issues of fact to be resolved by a factfinding jury and not by judicial prescreening.

In sum, I suggest that cutting Black Smokers of f before they have had the opportunity to demonstrate that they can deliver as advertised5 in their Complaint does violence to the fundamental principles of judicial reading of complaints, as acknowledged both in the majority opinion and in this dissent. Accordingly, I respectfully dissent in the respects spoken of here.

_____

5. Admittedly a bad pun.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

34